STATE OF NORTH CAROLINA v. JERRY RAY CUMMINGS

No. 65A87

(Filed 6 October 1988)

1. **Homicide § 21.5— first degree murder—malice, premeditation and delibera-tion—sufficient evidence**

   The evidence raised inferences of malice, premeditation and deliberation sufficient to survive defendant's motion to dismiss a charge of first degree murder where it tended to show that defendant calmly volunteered his serv-ices as an assassin to his cousin after the cousin had a dispute with the victim about a missing dog and then worked out the details of the crime with the cousin's help; the two planned a ruse to gain access to the victim and discussed the need for assistance by the cousin's girlfriend; and defendant then carried out the plan, announcing his deadly intention to the victim before shooting him with a .22-caliber pistol.

2. **Criminal Law § 106— credibility of State's witness—interest in outcome of case—dismissal of charge not required**

   The trial court was not required to dismiss a charge of first degree murder on the basis of defendant's contention that the State's chief witness lied about the murder to protect her boyfriend and cover up her own involve-ment in the crime since the credibility of the witness and her interest in the outcome of the case were matters for the jury to consider.

3. **Homicide § 18.1— premeditation and deliberation—intoxication of defendant**

   Although some evidence of defendant's intoxication was presented in a first degree murder case, the evidence was sufficient to support a finding that defendant was not so intoxicated as to be incapable of premeditation and deliberation where it tended to show that defendant coolly and coherently planned the murder with his cousin; defendant had the presence of mind to realize that the victim would not open the door for him and to communicate this problem to his cousin; defendant was alert enough to compel participation in the crime by the cousin's girlfriend by grabbing her arm when she tried to turn back while they were on their way to the victim's house; defendant was able to give the girlfriend instructions about her role in the ruse used to get the victim to open the door to his house; defendant held a conversation with the victim and distracted him long enough to position himself for the shooting; after the shooting defendant carefully removed a spent cartridge casing from the gun; and defendant made intimidating statements to the cousin's girlfriend to coerce her silence about the shooting.

4. **Criminal Law § 102.6— jury argument—impact of murder upon victim's family**

   The prosecutor's references in his jury argument in a first degree murder case to the impact of the crime upon members of the victim's family who testi-fied for the State did not require the trial court to intervene ex mero motu. A reference to a show of emotion on the stand by the victim's brother-in-law was not a bid for sympathy but was a legitimate argument concerning credibility,

State v. Cummings

and a reference to the discovery of the victim's body by a sixteen-year-old family member was nothing more than a brief capsulization of the boy's testimony and was properly rooted in the evidence.

5. **Criminal Law § 135.6— first degree murder—sentencing hearing—prior murder conviction—eyewitness testimony**

In the sentencing phase of a first degree murder case in which the State introduced a certified copy of the court records of defendant's conviction of first degree murder in 1966, defendant was not prejudiced by the admission of eyewitness testimony detailing the factual circumstances of the 1966 murder where the testimony was neither excessive nor repetitious; the trial judge exercised the necessary discretion to prevent the hearing from degenerating into a mini-trial of the prior murder; and defendant was given the opportunity to impress upon the jury that the prior crime was alcohol related.

6. **Criminal Law § 102.3— sentencing hearing—improper jury argument—necessity for objection**

The scope of an argument at the sentencing hearing is governed by the same general rules that apply to argument during the guilt proceedings. Consequently, when remarks of the prosecutor during the sentencing argument are not objected to at trial, the alleged impropriety must be glaring or grossly egregious for the appellate court to determine that the trial judge erred in failing to take corrective action sua sponte.

7. **Criminal Law § 102.6— capital case—jury argument—effect on victim's family—harmless error**

Assuming arguendo that the prosecutor's jury argument during the sentencing phase of a first degree murder case concerning the effect of the crime on certain members of the victim's family was improper under *Booth v. Maryland*, 482 U.S. --- (1987) (use of victim impact statements during sentencing phase of capital case violates Eighth Amendment), and that the impropriety was sufficiently glaring to call for the trial judge's intervention ex mero motu, the trial judge's failure to take corrective action was harmless error in light of the aggravating circumstance found by the jury, the complete absence of mitigation, and the overwhelming evidence against defendant.

8. **Criminal Law § 135.9— capital case—mitigating circumstances—unanimity requirement not unconstitutional**

The trial judge in a capital case did not commit plain error under *Mills v. Maryland*, 480 U.S. --- (1988), by instructing the jury that its decisions as to mitigating circumstances must be unanimous.

9. **Criminal Law § 135.10— death sentence not disproportionate**

A sentence of death imposed on defendant for first degree murder was not disproportionate within the meaning of N.C.G.S. § 15A-2000(d)(2) where the jury found the single aggravating circumstance that defendant had previously been convicted of another capital felony, N.C.G.S. § 15A-2000(e)(2), and found no mitigating circumstances, and where the evidence showed that defendant volunteered his services as an assassin of the elderly victim after defendant's cousin and the victim had a dispute about a missing dog.

Chief Justice EXUM dissenting as to sentence.

Justice FRYE dissenting as to sentence.

APPEAL by defendant from judgment sentencing him to death on his conviction of murder in the first degree, said judgment imposed by *Preston, J.,* at the 19 January 1987 session of Superior Court, ROBESON County. Heard in the Supreme Court 12 April 1988 and 22 August 1988.

*Lacy H. Thornburg, Attorney General, Joan H. Byers, Special Deputy Attorney General, James J. Coman, Senior Deputy Attorney General, and William N. Farrell, Jr., Special Deputy Attorney General, for the state.*

*Robert D. Jacobson, E. C. Bodenheimer, Jr., and Hubert N. Rogers III, for defendant.*

MARTIN, Justice.

Defendant assigns error to both the guilt phase and the sentencing phase of his capital trial. Having carefully reviewed the entire record and each of defendant's arguments, we find no error in either phase and decline to disturb defendant's conviction and sentence.

The state's evidence tended to show the following: On 16 August 1986 the body of Jesse Ward, aged seventy-seven, was discovered in the kitchen of his Robeson County home. The victim had spent the previous day helping his brother-in-law, Henry Powell, fix a lawn mower and had planned to return to Powell's home on the morning of the sixteenth to finish the job. When the victim did not arrive as scheduled, Powell called him on the telephone repeatedly but always received a busy signal. Later that day Powell and his grandson Richard went by the victim's house. Richard and a neighbor entered the house through the back door and discovered the victim's body on the kitchen floor. They observed two holes in the victim's abdomen and blood on his trousers. The victim held the telephone receiver in his left hand, pressed against his ear.

Investigators recovered a cartridge casing from the grass near the back door and a spent .22-caliber bullet from the kitchen sink. There were two round holes in the back screen door. An

autopsy performed by Dr. Marvin Thompson revealed two penetrating gunshot entrance wounds on the victim's abdomen and a single exit wound on his back. A .22-caliber bullet was lodged in the victim's spinal column and his abdominal cavity contained two liters of blood. Dr. Thompson determined the cause of death to be "hemorrhage secondary to gunshot wounds."

The shooting occurred just north of Maxton near the intersection of Highway 71 and Rural Paved Road 1312. The victim's home sits approximately 135 feet east of a small grocery store located at the corner of the intersection. Haven Betsy's house is some 527 feet south of the store. On 17 August Detective A. W. Oxendine took statements from Grady Jacobs and Patty Faye Locklear, residents of the Betsy home. Shortly thereafter Oxendine obtained a warrant for defendant's arrest.

The state based its case primarily upon Patty Faye Locklear's eyewitness account of the crime. Ms. Locklear testified that on 15 August 1986 she was living at Haven Betsy's house with her boyfriend Grady Jacobs. Defendant, who is Jacobs' first cousin, had also been living there but had moved out at the end of July after threatening to kill Betsy during a drunken confrontation. Nonetheless, he continued to visit the Betsy home every evening after work. Defendant often displayed a silver .22-caliber pistol: "We would be sitting in the house—you know—drinking and he never would pull it out until he got real high."

Jacobs and Ms. Locklear had become acquainted with their elderly neighbor, the victim Jesse Ward, several weeks before the crime. Mr. Ward gave them rides to Lumberton and on one occasion they spent the night at his home. On 5 August 1986, Jacobs bought a dog from Mr. Ward, making a down payment of seven or eight dollars. However, the dog soon escaped from its new owner and returned to the Ward home. Jacobs retrieved the dog but it got loose once more, never to be seen again.

On the evening of 15 August defendant came by Haven Betsy's house. Ms. Locklear, Jacobs, and defendant drank for about thirty minutes, then walked to a friend's house about three-quarters of a mile away. Jacobs, who had broken his foot two days before, used crutches and walked very slowly. Defendant drank about a half a fifth of liquor during the visit. On the way back to Betsy's, the group stopped by the Ward home because

Jacobs wanted to inquire about the missing dog. They went around to the back door and Jacobs asked Mr. Ward if he had the dog. Mr. Ward responded that he did not. Jacobs said he wanted the money or the dog. Mr. Ward indicated that he had neither and slammed the door.

As they walked away Jacobs angrily noted that Mr. Ward "was going to pull that shit on the wrong person and they was going to kill him." A few minutes later defendant asked if Jacobs wanted him to kill Mr. Ward. Jacobs responded "Yeah, kill the old son-of-a-bitch." Jacobs suggested that defendant lure Mr. Ward away from home by asking him to help carry a washing machine. He told defendant not to shoot Mr. Ward at home because "all them houses will hear it." Defendant asked Jacobs to accompany him on the fatal errand but Jacobs declined, noting that his broken foot would prevent him from fleeing the scene if necessary. When defendant protested that Mr. Ward would probably not open the door for him, Jacobs ordered Ms. Locklear to go along. Ms. Locklear reluctantly complied because she was afraid of the two men. She tried to turn back at one point but defendant grabbed her arm.

When they got to the Ward home defendant instructed Ms. Locklear to knock at the back door and identify herself. Mr. Ward came to the door and defendant started talking about the washing machine. Mr. Ward told him it was late and the machine probably would not fit in his trunk anyway. At that point defendant drew his gun and said "I'm going to kill you you old white son-of-a-bitch." He shot twice. Mr. Ward slammed the door. Ms. Locklear heard him exclaim "Oh" and then heard something fall. She and defendant ran back to Haven Betsy's house where defendant removed the remaining bullets from the gun. He offered a spent cartridge casing to Ms. Locklear but she refused to take it. Defendant said he would "hold the evidence." He looked at Ms. Locklear and declared "That's what I do to a person that tells on me."

Jacobs and Ms. Locklear first talked to police on 17 August. Their original statements made no mention of Jacobs' role in planning the killing. Statements taken 18 December were more complete and were essentially consistent with Ms. Locklear's trial testimony. Both Jacobs and Ms. Locklear were subsequently charged with conspiracy to commit murder.

Robeson County officers arrested defendant on 17 August at Haven Betsy's house. A search incident to the arrest yielded a .22-caliber semi-automatic pistol which had been hidden in defendant's left sock. Although the bullet retrieved from the victim's body was too deformed to determine if it had been fired from defendant's gun, the bullet retrieved from the kitchen sink had rifling characteristics similar to those in the gun's barrel, and the cartridge casing retrieved from the victim's yard matched casings fired from the gun. A further search of defendant at the sheriff's department yielded fifteen hollow-point .22-caliber long-rifle cartridges.

After defendant was taken into custody, he made three brief but somewhat contradictory statements. When asked if he shot Mr. Ward, he responded "I did it." He later said "if I shot the man, I don't remember it." As he was taken to be fingerprinted, he stated "If I go down I'm not going down alone." After the fingerprinting he made a statement blaming the shooting on Grady Jacobs and Patty Faye Locklear.

At trial defendant testified on his own behalf and denied shooting Mr. Ward. His evidence tended to show the following: On 15 August he drank three cans of beer and three vodka drinks after work. He then filled up a pint bottle with vodka, put his gun in his pocket, and went to Haven Betsy's house. When he arrived Grady Jacobs approached him and asked to borrow the gun. Defendant gave it to him and they had a drink. They then walked to a friend's house and finished off the pint. At one point they drove to defendant's house for more liquor and defendant got "pretty well loaded." On the way back to Betsy's house at about 12:30 or 1:00 a.m., they stopped at the corner grocery store to get soft drinks out of the machine. Defendant was "pretty high" but was not staggering. Jacobs and Ms. Locklear went to the Ward home while defendant remained at the store. Shortly thereafter defendant heard two or three shots. Jacobs and Ms. Locklear returned to the store arguing, then hurriedly retreated to Betsy's house. Jacobs returned defendant's gun.

On cross-examination, defendant admitted convictions for larceny in 1962; murder in the first degree, escape from prison, and auto larceny in 1966; escape from prison in 1969; escape from prison and auto larceny in 1971; and driving under the influence

in 1983. The jury convicted defendant of murder in the first degree based on a theory of premeditation and deliberation.

During the sentencing phase the state presented evidence with regard to defendant's prior murder conviction. Ula Lowry testified that on 22 May 1966 she went riding with defendant and his uncle, Otis Bryant. Defendant sat in the backseat and Bryant drove while both men drank white liquor. After riding around for a few hours they came to a particular crossroads. Defendant ordered Bryant to turn left towards home, but Bryant proceeded straight across the intersection instead. Defendant then shot Bryant in the back four times with a .22-caliber pistol. When Bryant fell over onto Ms. Lowry's lap and the car came to a stop, defendant got out and ran into the woods. There had been no argument and defendant did not appear drunk.

Defendant again testified on his own behalf, expressing remorse for the death of Jesse Ward. His evidence tended to show that he has a third-grade education and cannot read or write. Otis Bryant's murder occurred after he and Bryant had finished a half-gallon jar of white liquor. He cannot say exactly what happened that day in 1966 because he was "pretty well loaded." He was paroled three times but each time returned to prison after conviction for driving under the influence. He has escaped from prison several times, including an escape while awaiting trial in the present case. Although he sought treatment for alcoholism on several occasions, he failed to take the medication he was given.

The jury found N.C.G.S. § 15A-2000(e)(2), defendant's prior capital felony conviction, to be the sole aggravating circumstance and rejected each of the four mitigating circumstances submitted. Upon unanimously finding beyond a reasonable doubt that the aggravating circumstance was sufficiently substantial to call for the imposition of the death penalty, the jury recommended that defendant be sentenced to death. Judgment of execution was entered 27 January 1987. Defendant appeals this sentence as a matter of right under N.C.G.S. § 7A-27(a).

GUILT PHASE

Defendant first contends that the trial judge improperly denied his motions to dismiss the charge of murder in the first

degree. We note at the outset that the denial of defendant's motion to dismiss at the close of the state's evidence is not properly at issue on this appeal. Defendant chose to offer evidence after his motion was denied and thereby waived appellate review of the trial judge's decision. *State v. Griffin,* 319 N.C. 429, 355 S.E. 2d 474 (1987); N.C.G.S. § 15-173 (1983). We need only address defendant's motion to dismiss at the close of all the evidence.

In considering a motion to dismiss in a criminal matter, the trial court must determine whether there is substantial evidence of each element of the offense charged and substantial evidence that the defendant is the perpetrator. *State v. Bullard,* 312 N.C. 129, 322 S.E. 2d 370 (1984). The evidence must be examined in the light most favorable to the state, and the state is entitled to every reasonable inference to be drawn therefrom. *State v. Bright,* 301 N.C. 243, 271 S.E. 2d 368 (1980). Any contradictions or discrepancies in the evidence are for the jury to resolve and do not warrant dismissal. *State v. Powell,* 299 N.C. 95, 261 S.E. 2d 114 (1980).

Murder in the first degree is the intentional and unlawful killing of a human being with malice, premeditation, and deliberation. *State v. Fleming,* 296 N.C. 559, 251 S.E. 2d 430 (1979); N.C.G.S. § 14-17 (1986). Premeditation means that the defendant formed the specific intent to kill for some length of time, however short, before the actual killing. *State v. Misenheimer,* 304 N.C. 108, 282 S.E. 2d 791 (1981). Deliberation means that the intent to kill was executed in a cool state of blood, without legal provocation, and in furtherance of a fixed design for revenge or to accomplish some unlawful purpose. *State v. Britt,* 285 N.C. 256, 204 S.E. 2d 817 (1974). No particular length of time is required for the mental processes of premeditation and deliberation; it is sufficient that the processes occur prior to, and not simultaneously with, the killing. *State v. Perry,* 276 N.C. 339, 172 S.E. 2d 541 (1970).

Premeditation and deliberation ordinarily must be proved by circumstantial rather than direct evidence. *State v. Brown,* 315 N.C. 40, 337 S.E. 2d 808 (1985), *cert. denied,* 476 U.S. 1165, 90 L.Ed. 2d 733 (1986). Some of the circumstances which may support an inference of premeditation and deliberation are: the brutality of the killing, the nature and number of the victim's wounds, the dealing of lethal blows after the victim has been felled and

rendered helpless, a lack of provocation on the part of the victim, the conduct and statements of the defendant before and after the killing, threats and declarations of the defendant before and during the course of the occurrence giving rise to the death of the deceased, and ill-will or previous difficulty between the parties. *Id.* Malice may be inferred from the use of a deadly weapon. *State v. Lang,* 309 N.C. 512, 308 S.E. 2d 317 (1983).

[1] Applying these familiar principles to the case at hand, we find ample evidence of the elements of first-degree murder in the shooting of Jesse Ward. In the light most favorable to the state the evidence supported the inference that defendant formed the intent to kill well in advance of the murderous deeds. The evidence tended to show that defendant calmly volunteered his services as an assassin to Grady Jacobs shortly after Jacobs' dispute with the victim, then worked out the details of the crime with Jacobs' help. The two planned a ruse to gain access to the victim and discussed the need for Patty Faye Locklear's assistance. Defendant then carried out the plan, announcing his deadly intention to the victim before shooting him with a .22-caliber pistol. Defendant's conduct and declarations, coupled with the lack of legal provocation on the part of the victim, raised inferences of malice, premeditation, and deliberation sufficient to survive the motion to dismiss.

[2] Defendant presents two arguments in support of the motion. He first submits that the testimony of Patty Faye Locklear, from which most of the state's evidence was gleaned, was not substantially sufficient to convince a reasonable trier of fact that defendant was the perpetrator of the offense. Defendant contends that Ms. Locklear had an interest in the outcome of the case and therefore lied about the murder in order to protect Grady Jacobs and cover up her own involvement in the crime. We find no merit in this argument. As previously noted, the evidence on a motion to dismiss must be viewed in the light most favorable to the state. Ms. Locklear's credibility and her interest in the outcome of the case were matters for the jury to consider. *State v. Locklear,* 322 N.C. 349, 368 S.E. 2d 377 (1988).

[3] Alternatively, defendant argues that he was so intoxicated at the time of the offense that he was incapable of forming a premeditated and deliberate purpose to kill. The general rule on

intoxication may be stated as follows: If at the time of the killing the defendant was so intoxicated as to be utterly incapable of forming a premeditated and deliberate intent to kill, he may not be found guilty of first-degree murder because an essential element of the crime is missing. *State v. Goodman*, 298 N.C. 1, 257 S.E. 2d 569 (1979). However, no inference of the absence of premeditation and deliberation arises from intoxication as a matter of law, because intoxication does not necessarily render a person incapable of engaging in the thought processes of premeditation and deliberation. *State v. Locklear*, 322 N.C. 349, 368 S.E. 2d 377; *State v. Lowery*, 309 N.C. 763, 309 S.E. 2d 232 (1983).

Here, although there was some evidence of intoxication presented, there was also considerable evidence to the contrary. Ms. Locklear's testimony painted a vivid portrait of defendant coolly and coherently planning the murder with Grady Jacobs. Defendant had the presence of mind to realize that the victim would not open the door for him and to communicate this problem to Jacobs. He was alert enough to compel Ms. Locklear's participation in the crime by capturing her as she attempted to turn back. He was also able to give her instructions about her role in the ruse. He managed to hold a conversation with the victim and distracted him long enough to position himself for the shooting. After the shooting he carefully removed "the evidence" from the gun and made intimidating statements to Ms. Locklear to coerce her silence. Viewing this evidence in the light most favorable to the state, it is sufficient to support a finding that defendant was not so intoxicated as to be incapable of premeditation and deliberation.

We conclude that the trial court properly denied defendant's motion to dismiss. For the same reasons, his motion for directed verdict of acquittal was also properly denied. Such motions challenge the sufficiency of the evidence to go to the jury and have the same legal effect as motions for dismissal. *State v. Barbour*, 295 N.C. 66, 243 S.E. 2d 380 (1978).

[4] By his next assignment or error, defendant contends that he was prejudiced by references to the impact of the crime upon the victim's family. Defendant challenges the following portion of the district attorney's closing argument in the guilt phase:

This lawsuit, like I would suggest 99% of all criminal lawsuits, comes down to what Mr. Jacobson talked about.

Credibility. Just simply, who can you afford to believe as you go about doing your duty in this case? Do you believe for instance, ladies and gentlemen of the jury, Mr. Henry Powell? The 80-year-old-gentlemen sitting here. What reason has he got to tell you anything but the truth?

His emotion on that stand, ladies and gentlemen, was not fake[d] for your benefit as I would suggest to you was the emotion that this defendant sitting over here purported to display for your—whatever heart strings he could pull on. That old man misses his brother-in-law who was in good health over there that day helping at his home.

Do you believe what Mr. Powell has to say about this case? He had absolutely no reason to tell you anything but the truth about the events of August 15th and August 16th 1986. Do you believe him?

Do you believe, ladies and gentlemen of the jury, the young boy sitting there, Richard Powell, Jr., sixteen years of age. The boy that tells you when he put his hand on the door knob something struck him. He couldn't push it open. He was filled with trepidation for some reason as his grandfather and others went around the house hollering for Jesse. And eventually he got his nerve up and pushed open the door. And when he did he found his grandfather [great-uncle] lying there in the blood with the holes in his chest.

. . . .

Do you believe what little Richard Powell has to say about this case? He has no reason to tell you anything but the absolute truth about the events of that day.

Defendant urges that this argument's emotional appeal was unduly inflammatory.

We have recognized that counsel must be allowed wide latitude in the argument of a hotly contested case. *State v. Britt,* 288 N.C. 699, 220 S.E. 2d 283 (1975). However, we have also stressed that "the jury's decision must be based solely on the evidence presented at trial and the law with respect thereto, and not upon the jury's perceived accountability to the witnesses, to the victim, to the community, or to society in general." *State v.*

*Boyd,* 311 N.C. 408, 418, 319 S.E. 2d 189, 197 (1984), *cert. denied,* 471 U.S. 1030, 85 L.Ed. 2d 324 (1985). Arguments emphasizing mercy, prejudice, pity, or fear are inappropriate in the guilt phase of the trial, in which the jury's focus is properly upon guilt or innocence. *State v. Oliver,* 309 N.C. 326, 307 S.E. 2d 304 (1983).

Defendant failed to object to the alleged error. In a capital case

> an appellate court may review the prosecution's argument, even though defendant raised no objection at trial, but the impropriety of the argument must be gross indeed in order for this Court to hold that a trial judge abused his discretion in not recognizing and correcting *ex mero motu* an argument which defense counsel apparently did not believe was prejudicial when he heard it.

*State v. Johnson,* 298 N.C. 355, 369, 259 S.E. 2d 752, 761 (1979).

Here the argument does not rise to the level of gross impropriety. Viewed in context, the reference to Henry Powell's show of emotion on the stand was not a bid for sympathy but instead a small portion of counsel's lengthy discussion of credibility issues. This discussion encouraged an assessment of the relative credibility of each and every witness based on many factors including demeanor on the witness stand. The demeanor of witnesses is a matter before the jury and may legitimately be argued to them. *Cf. State v. Brown,* 320 N.C. 179, 358 S.E. 2d 1, *cert. denied,* --- U.S. ---, 98 L.Ed. 2d 406 (1987); *State v. Myers,* 299 N.C. 671, 263 S.E. 2d 768 (1980); *State v. Greene,* 33 N.C. App. 228, 234 S.E. 2d 428 (1977). Furthermore, the reference to Richard Powell's discovery of the victim's body was nothing more than a brief capsulization of the boy's testimony. As such it was rooted in the evidence.

Arguments of counsel are left largely to the discretion of the trial judge. *State v. Huffstetler,* 312 N.C. 92, 322 S.E. 2d 110 (1984), *cert. denied,* 471 U.S. 1009, 85 L.Ed. 2d 169 (1985). In the absence of a contemporaneous objection by defendant we do not find that the prosecutor's remarks warranted intervention by the trial judge. *See State v. Brown,* 320 N.C. 179, 358 S.E. 2d 1 (guilt phase argument that the family of the victim had only the jury to turn to for justice not so improper as to require intervention ex

mero motu); *State v. King*, 299 N.C. 707, 264 S.E. 2d 40 (1980) (argument questioning what went through the minds of the victim's family at the cemetery not so improper as to require intervention ex mero motu). This assignment of error is overruled.

We find no error in the guilt phase.

### SENTENCING PHASE

[5] By his first assignment of error in the sentencing phase, defendant contends that he was prejudiced by the admission of direct evidence detailing the factual circumstances of the 1966 murder of Otis Bryant. He claims that the testimony of Ula Lowry transformed the sentencing proceedings into a "mini-trial" of the earlier offense.

We have held that the prosecution must be permitted to present any competent, relevant evidence relating to defendant's character or record which will substantially support the imposition of the death penalty, so as to avoid arbitrary or erratic sentencing. *State v. Brown*, 315 N.C. 40, 337 S.E. 2d 808. The preferred method for proving a prior conviction includes the introduction of the judgment itself into evidence. *State v. Maynard*, 311 N.C. 1, 316 S.E. 2d 197, *cert. denied*, 469 U.S. 963, 83 L.Ed. 2d 299 (1984). Although a prior conviction *may* be proved by stipulation or by original certified copy of the court record, the state is not precluded from other methods of proof. *State v. Thompson*, 309 N.C. 421, 307 S.E. 2d 156 (1983).

The better rule is to allow both sides to introduce evidence in support of aggravating and mitigating circumstances which have been admitted into evidence by stipulation. *State v. Taylor*, 304 N.C. 249, 283 S.E. 2d 761 (1981), *cert. denied*, 463 U.S. 1213, 77 L.Ed. 2d 1398, *reh'g denied*, 463 U.S. 1249, 77 L.Ed. 2d 1456 (1983). Defendant cannot by stipulation foreclose the state's proof by limiting it to the bare record of the conviction. *State v. Maynard*, 311 N.C. 1, 316 S.E. 2d 197. Here the evidence in question was neither excessive nor repetitious and the trial judge exercised the necessary discretion to prevent the hearing from degenerating into a mini-trial of the prior crime. Moreover, defendant was given the opportunity to impress upon the jury that the prior crime was alcohol-related. This could only have worked to the defendant's advantage as he sought to establish mitigating circumstances relating to his purported alcoholism.

In the same vein, defendant contends that the district attorney should have been precluded from cross-examining him about the prior murder and from arguing the circumstances of it in his remarks to the jury. Because we hold that evidence concerning defendant's prior conviction was relevant and properly admitted, the state was clearly entitled to cross-examine defendant with respect to the conviction and to argue the matter to the jury. These assignments of error are overruled.

Defendant next assigns error to the district attorney's mention of the victim's family in his sentencing phase jury remarks:

> Mr. Ward will never see young Richard grow up to [be] a strong young man and raise a family. He will never see great nephews and nieces of his live, and grow up because he's gone. Those little things—the opportunity to bounce on his knee the child produced by this boy here, he'll never see.
>
> . . . .
>
> Well, [defendant] took not only the life of Jesse Ward, ladies and gentlemen of the jury, he took the life of a loved one as well. He took from Mr. Henry Powell a beloved brother-in-law. No one can deny the emotions that the old man showed on the witness stand. He took from the young boy there, Richard, an uncle. He took from the family one that they loved.

[6] Defendant failed to object to these remarks. The scope of an argument at the sentencing hearing is governed by the same general rules that apply to argument during the guilt proceedings. Consequently, when remarks of the prosecutor during the sentencing argument were not objected to at trial, the alleged impropriety must be glaring or grossly egregious for this Court to determine that the trial judge erred in failing to take corrective action sua sponte. *State v. Pinch*, 306 N.C. 1, 292 S.E. 2d 203, *cert. denied*, 459 U.S. 1056, 74 L.Ed. 2d 622 (1982), *reh'g denied*, 459 U.S. 1189, 74 L.Ed. 2d 1031 (1983).

[7] Defendant maintains that the prosecutor's argument was improper under *Booth v. Maryland*, 482 U.S. ---, 96 L.Ed. 2d 440 (1987), in which the United States Supreme Court held that the use of victim impact statements during the sentencing phase of capital cases violates the eighth amendment. In discussing *Booth* we have stated that

[t]he Supreme Court's decision in *Booth* brings into question language in *Pinch* and *Oliver* that the value of the victim's life may be considered by the jury during sentencing. *See State v. Pinch,* 306 N.C. at 25, 292 S.E. 2d at 222, *cert. denied, Smith v. North Carolina,* 459 U.S. 1056, 74 L.Ed. 2d 622, *reh'g denied, Pinch v. North Carolina,* 459 U.S. 1189, 74 L.Ed. 2d 1031; *State v. Oliver,* 309 N.C. at 360, 307 S.E. 2d at 326. If the touchstone for propriety in sentencing arguments is whether the argument relates to the character of the criminal or the nature of the crime, *see State v. Oliver,* 309 N.C. at 360, 307 S.E. 2d at 326, then, arguably, the effects of that crime on those the victim leaves behind are not relevant.

*State v. Brown,* 320 N.C. 179, 202-03, 358 S.E. 2d 1, 17.

Assuming arguendo that the remarks were improper under *Booth* and that the impropriety was sufficiently glaring to call for the trial judge's intervention ex mero motu, we nonetheless conclude that defendant was not prejudiced by the trial judge's failure to take corrective action. In light of the aggravating circumstance found, the complete absence of mitigation, and the overwhelming evidence against defendant, any error in this respect was harmless beyond a reasonable doubt. N.C.G.S. § 15A-1443(b) (1983).

[8] Finally, defendant contends that the trial judge committed plain error in instructing the jury that its decisions as to mitigating circumstances must be unanimous. Defendant, relying on the recent decision of the United States Supreme Court in *Mills v. Maryland,* 486 U.S. ---, 100 L.Ed. 2d 384 (1988), urges that the instructions on unanimity entitle him to a new sentencing hearing. For the reasons expressed in *State v. McKoy,* 323 N.C. 1, 372 S.E. 2d 12 (1988), we reject defendant's argument.

PROPORTIONALITY

Having determined that the guilt and sentencing phases of defendant's trial were free of prejudicial error, we now turn to our statutory duties pursuant to the mandate of N.C.G.S. § 15A-2000(d)(2). The statute sets forth a tripartite test as a check against the random or capricious imposition of the death penalty. *State v. Jackson,* 309 N.C. 26, 305 S.E. 2d 703 (1983); *State v. Hutchins,* 303 N.C. 321, 279 S.E. 2d 788 (1981). We must determine

(1) whether the record supports the jury's finding of the aggravating circumstance or circumstances upon which it based the death sentence; (2) whether the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor; and (3) whether the sentence is excessive or disproportionate to the penalty imposed in similar cases. *State v. Williams*, 308 N.C. 47, 301 S.E. 2d 335, *cert. denied*, 464 U.S. 865, 78 L.Ed. 2d 177, *reh'g denied*, 464 U.S. 1004, 78 L.Ed. 2d 704 (1983).

We consider the responsibility placed upon us by subdivision (d)(2) to be as serious as any responsibility placed upon an appellate court. *State v. Jackson*, 309 N.C. 26, 305 S.E. 2d 703; *State v. Rook*, 304 N.C. 201, 283 S.E. 2d 732 (1981), *cert. denied*, 455 U.S. 1038, 72 L.Ed. 2d 155 (1982). Thus, we accord the review of capital cases our utmost care and diligence. *State v. Pinch*, 306 N.C. 1, 292 S.E. 2d 203; *State v. Smith*, 305 N.C. 691, 292 S.E. 2d 264, *cert. denied*, 459 U.S. 1056, 74 L.Ed. 2d 622 (1982), *reh'g denied*, 459 U.S. 1189, 74 L.Ed. 2d 1031 (1983). We have carefully reviewed the record on appeal, transcript, and exhibits in this case along with the briefs and oral arguments presented. After full and cautious deliberation, we conclude that the record fully supports the jury's finding of the aggravating circumstance submitted. Furthermore, we find no indication that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary or impermissible factor.

[9] Finally, we undertake the solemn task of proportionality review, whereby we compare both the defendant and the crime to similar cases in the proportionality pool. The pool includes all cases arising since 1 June 1977 which have been tried as capital cases and reviewed on direct appeal by this Court and in which the jury recommended death or life imprisonment or in which the trial court imposed life imprisonment after the jury failed to agree on a sentencing recommendation. *State v. Williams*, 308 N.C. 47, 301 S.E. 2d 335. The pool includes only those cases which have been affirmed by this Court as to both phases of the trial. *State v. Jackson*, 309 N.C. 26, 305 S.E. 2d 703. In making the comparison, we do not simply engage in rebalancing the aggravating and mitigating circumstances; rather, we are obligated to scour the entire record for all the circumstances of the case and the manner in which the defendant committed the crime, as well as the defendant's character, background, and mental and physical

condition. *State v. McLaughlin*, 323 N.C. 68, 372 S.E. 2d 49 (1988); *State v. Lawson*, 310 N.C. 632, 314 S.E. 2d 493 (1984), *cert. denied*, 471 U.S. 1120, 86 L.Ed. 2d 267 (1985). We do not feel bound to give a citation to every case used for comparison. *State v. Bondurant*, 309 N.C. 674, 309 S.E. 2d 170 (1983).

In this case the jury found the single aggravating circumstance that defendant had been previously convicted of another capital felony, N.C.G.S. § 15A-2000(e)(2). The jury found no circumstances in mitigation.

To date this Court has affirmed the guilt and sentencing phases in thirty-eight capital cases. We have vacated the death sentence as disproportionate in six of those: *State v. Stokes*, 319 N.C. 1, 352 S.E. 2d 653 (1987); *State v. Rogers*, 316 N.C. 203, 341 S.E. 2d 713 (1986); *State v. Young*, 312 N.C. 669, 325 S.E. 2d 181 (1985); *State v. Hill*, 311 N.C. 465, 319 S.E. 2d 163 (1984); *State v. Bondurant*, 309 N.C. 674, 309 S.E. 2d 170; and *State v. Jackson*, 309 N.C. 26, 305 S.E. 2d 703. Defendant's case has little in common with these six. In each there was significant mitigation found by the jury. In *Bondurant*, for example, the defendant sought immediate medical aid for his victim and cooperated with law enforcement officers. In *Stokes* and *Young*, the defendants were teenagers. In *Jackson*, *Hill*, and *Rogers*, the defendants had no significant history of prior criminal conduct. More to the point, in none of the cases held disproportionate had the defendant killed another person prior to the murder for which he received the death penalty.

Defendant's case is in fact unique among all those constituting the proportionality pool. His is the only case in which the jury found the prior capital felony aggravating circumstance under N.C.G.S. § 15A-2000(e)(2). For purposes of comparison, then, we look to cases in which a very similar circumstance, conviction of a prior violent felony, was found pursuant to N.C.G.S. § 15A-2000(e)(3), and in which the prior violent felony resulted in the victim's death. Sections (e)(2) and (e)(3) are the only enumerated aggravating circumstances which reflect upon a defendant's character as a recidivist. *State v. Brown*, 320 N.C. 179, 358 S.E. 2d 1. They tend to demonstrate that the crime committed was part of a long-term course of violent conduct. *Id.*

Our research reveals five cases in which the defendant had been convicted of a prior violent felony resulting in the victim's death. In four of the cases the jury found some circumstances in mitigation but recommended a sentence of death: *State v. McKoy*, 323 N.C. 1, 372 S.E. 2d 12 (previous conviction of murder in the second degree); *State v. McLaughlin*, 323 N.C. 68, 372 S.E. 2d 49 (previous conviction of involuntary manslaughter); *State v. Taylor*, 304 N.C. 249, 283 S.E. 2d 761 (previous conviction of murder in the first degree); *State v. McDowell*, 301 N.C. 279, 271 S.E. 2d 286 (1980), *cert. denied*, 450 U.S. 1025, 68 L.Ed. 2d 220, *reh'g denied*, 451 U.S. 1012, 68 L.Ed. 2d 865 (1981) (previous conviction of murder in the second degree).

In only one case did the jury recommend a life sentence: *State v. Withers*, 311 N.C. 699, 319 S.E. 2d 211 (1984). In *Withers* the defendant shot and killed his fiancee's twelve-year-old daughter after an argument concerning her accusations of sexual abuse, then shot his fiancee and himself. The defendant had previously been convicted of murder in the first degree and had served thirteen years in prison for that crime before his release on parole. The jury found as aggravating circumstances that defendant had previously been convicted of a violent felony and that the murder of his fiancee's daughter was part of a course of violent conduct. The jury also found one or more of the ten mitigating circumstances submitted but did not specify which ones. We therefore must assume for purposes of proportionality review that all ten circumstances were found. *State v. Stokes*, 319 N.C. 1, 352 S.E. 2d 653.

Because of the substantial mitigation involved, *Withers* is distinguishable from the other cases in which the jury recommended death and from the instant case. Juries have consistently returned sentences of death when the defendant previously has been convicted of homicide, unless the mitigation involved is very substantial indeed. Here, of course, the jury found no circumstances in mitigation at all. In the absence of substantial mitigation, we cannot say that defendant's sentence is disproportionate when compared to other cases involving a prior homicide conviction.

This case also bears a striking factual similarity to *State v. Brown*, 320 N.C. 179, 358 S.E. 2d 1, in which the jury recommend-

ed the death penalty. As in this case, the defendant in *Brown* shot and killed an unsuspecting neighbor because of a grudge against him, the shooting occurred at the victim's home, and the defendant announced his intention to kill the victim to others in advance of the crime. Moreover, in *Brown,* as in this case, the sole aggravating circumstance found was that of a prior violent felony, and the jury found no mitigating circumstances. We find nothing in the record to meaningfully differentiate the instant case from *Brown* or to demonstrate that this defendant is any less deserving of the death penalty than the defendant in *Brown.*

All of the evidence in this case points to the senseless slaying of an elderly man undertaken in a startlingly casual manner. Defendant had no personal quarrel with the victim but took it upon himself to become involved in a dispute between his cousin and the victim about a missing dog. This evidence "paints a picture of defendant as a man shockingly ready to impose himself as an armed arbiter, to convert other's quarrels into quarrels of his own, and to go the ultimate length to dominate a situation." *State v. Green,* 321 N.C. 594, 614-15, 365 S.E. 2d 587, 599 (1988). The circumstances of this crime, like those of defendant's previous capital felony, demonstrate a callous disregard for the value of human life. Both crimes were "especially cold-blooded because of the absence of any motive of the sort which is usually powerful enough to cause one human being to destroy another." *Id.* at 614, 365 S.E. 2d at 599.

Considering the cold-blooded nature of the crime, defendant's criminal history, and the utter lack of mitigation present, we are satisfied that the facts of this case fully support the jury's recommendation of the death sentence for the murder of Jesse Ward and we hold as a matter of law that the sentence is not disproportionate within the meaning of N.C.G.S. § 15A-2000(d)(2). Upon this holding, the sentence of death is affirmed. In all phases of the trial below, we find

No error.

Chief Justice EXUM dissenting as to sentence.

I concur in the majority's treatment of the issues in the guilt phase of this case. Because I believe that most of the evidence of-

fered at the sentencing phase, much of it over defendant's objection, was incompetent, I dissent from the majority's conclusion that no error was committed in that phase and vote to remand the matter for a new sentencing hearing.

## I.

The state had evidence of only one statutorily permitted aggravating circumstance—defendant's conviction in 1966 of murder in the first degree, a capital felony. To prove this circumstance the state properly offered into evidence a certified copy of the court records of this conviction. These records showed that at the November 1966 Session of Superior Court, Hoke County, defendant pled guilty to the charge of murder in the first degree and was sentenced to life imprisonment.

The state then proceeded to call an eyewitness to the 1966 murder and elicited from her a graphic, detailed description of how the defendant committed that crime. The witness was permitted to testify that in 1966 she was riding as a passenger in the front seat of an automobile being operated by the victim, Otis Bryant. Defendant was in the back seat. When Bryant refused to turn left as instructed by defendant, defendant shot him three times in the back with a .22-caliber pistol. After the first shot the victim fell into the witness's lap. Defendant shot him two more times. The witness then testified that she begged defendant not to shoot her. Defendant said, "I'm not going to bother you," and left the scene of the crime.

After offering a stipulation that defendant had been paroled from prison in 1984, the state rested.

Defendant was called to testify in his own behalf. Almost all his testimony dealt with his family and work history, including work he had done while in prison, his various paroles from prison, and his treatment for alcoholism. With regard to his conviction of the 1966 murder, defendant testified only that on the day of the murder he and the victim had drunk "pretty near a half gallon jar" of white liquor.

Thereafter, the state cross-examined defendant at length concerning the extent to which he could recall the details of the former murder, his motive for shooting his victim on that occasion, and his culpability for the murder notwithstanding his consumption of alcohol.

State v. Cummings

The state then proceeded to cross-examine defendant at length regarding other convictions and other imprisonments. This cross-examination established that defendant had been previously convicted and served time for breaking and entering and driving under the influence. It also established that he had escaped from prison three times and once from jail while awaiting trial on the instant murder charge. The cross-examination ranged from the details of defendant's various transfers from one prison unit to another, his several escapes from prison, the manner in which these escapes were effected, and defendant's activities during the time he was an escapee. The flavor of some of this cross-examination may be gained from this sample:

Q. Well, after you spent a certain amount of time at McCain they sent you down to Lumberton; isn't that so?

A. Yes sir.

Q. And you promptly escaped again when you got to Lumberton?

MR. BODENHEIMER: Objection.

THE COURT: Overruled.

Q. Sir, isn't that right?

A. Let's see. I believe it is.

Q. Sir?

A. I believe it is.

Q. Where did you escape from this time? Did you go through the fence or walk off the job, or what?

MR. BODENHEIMER: Object.

THE COURT: Overruled.

Q. Sir?

A. It's been so long I can't remember.

Q. You remember swimming the river where one of the fellows drowned in the river? The two of you on escape.

MR. BODENHEIMER: Object.

THE COURT: Overruled.

State v. Cummings

A. Yes.

Q. Six of you on escape. You remember that?

A. Yes sir.

Q. You didn't physically yourself drowned that fellow in the river, did you?

MR. BODENHEIMER: Objection.

THE COURT: Sustained.

A. I went—

THE COURT: You don't have to answer that.

MR. BODENHEIMER: Move to strike.

THE COURT: Move to strike. The question is allowed. Question.

Q. All right. Well, now you certainly remember that, don't you, sir?

THE COURT: Just a second, Mr. Britt.

MR. BODENHEIMER: Request an instruction on that, Your Honor.

THE COURT: Members of the jury, do not consider it. Strike it from your minds.

Q. What time of the day did you escape on that occasion?

A. I just don't remember.

Q. Well, was it in the nighttime?

A. It was daytime.

Q. Did you go through the fence or just walk off the job or how did you escape?

THE COURT: I believe he said he didn't remember that.

MR. BRITT: He now remembers some other things now, Your Honor, like—

MR. BODENHEIMER: Object.

THE COURT: Just give him a question.

State v. Cummings

Q. How many of you escaped on this occasion?

A. There was six I believe.

Q. Now, you remember where the six escaped from, don't you?

A. Yes sir.

Q. Where?

A. I believe that time we went over the fence.

Q. Sir?

A. Went over the fence.

Q. Went over the fence?

A. Yes sir.

Q. Have you escaped so many times that you can't remember all the details of all the times?

MR. BODENHEIMER: Object.

THE COURT: Sustained.

MR. BODENHEIMER: Move to strike.

THE COURT: Motion to strike is allowed. Members of the jury, do not consider it.

Q. How did the six of you get over the fence?

A. I don't know.

Q. Sir?

A. I don't know.

Q. Did you cut through the fence or did you go over the fence?

MR. BODENHEIMER: Object.

THE COURT: Overruled.

A. Over it.

Q. Well, did you form a human pyramid and climb up that way or did you have a ladder or what did you do?

MR. BODENHEIMER: Object.

THE COURT: Sustained.

Q. Where were you captured on this escape?

A. (No response.)

Q. Tennessee, wasn't it?

A. Yes sir.

Q. Whereabouts in Tennessee did they catch you?

A. In Chattanooga.

Q. Chattanooga?

A. Yes sir.

Q. How had you gotten from Robeson County, North Carolina to Chattanooga, Tennessee?

MR. BODENHEIMER: Object.

THE COURT: Overruled.

Q. Sir?

A. How did I?

Q. Yes.

A. By bus.

Q. Where did you get the money for the bus?

MR. BODENHEIMER: Object.

THE COURT: Overruled.

Q. Sir?

A. I don't remember where I got the money from. I had some of my own.

Evidence adduced at the sentencing hearing occupies sixty pages of the trial transcript. Of these sixty, eighteen deal with defendant's 1966 murder conviction, and of these eighteen only one page, on which defendant testified to his having drunk white liquor, was proffered by defendant. For twenty-two pages the

state cross-examined defendant with regard to his other convictions, prison escapes, and his activities as an escapee. The remaining twenty pages, concerning defendant's family and work history and his treatment for alcoholism were proffered by defendant.

## II.

With regard to the 1966 murder conviction the sentencing hearing devolved, at the state's instance, into nothing less than a retrial of this incident which neither our capital sentencing statute nor the United States Constitution permits. Our capital sentencing statute, N.C.G.S. § 15A-2000, provides that "[a]ggravating circumstances which may be considered shall be limited to the following . . . .:" The statute then lists eleven circumstances, one of which is "[t]he defendant had been previously convicted of another capital felony." It seems clear to me that by this language the Legislature intended to permit essentially the fact of defendant's prior conviction of a capital felony, not a retrial of the felony itself, to be considered as an aggravating circumstance by a capital sentencing jury.

I recognize the Court has said,

the better rule here is to allow both sides to introduce evidence in support of aggravating and mitigating circumstances which have been admitted into evidence by stipulation. If the capital felony of which defendant has previously been convicted was a particularly shocking or heinous crime, the jury should be so informed. Conversely, it could be to defendant's advantage that he be allowed to offer additional evidence in support of possible mitigating circumstances, instead of being bound by the State's stipulation.

*State v. Taylor,* 304 N.C. 249, 279, 283 S.E. 2d 761, 780 (1981), *cert. denied,* 463 U.S. 1213, 77 L.Ed. 2d 1398, *reh'g denied,* 463 U.S. 1249, 77 L.Ed. 2d 1456 (1983). The Court has also said, "The defendant cannot by stipulation or otherwise foreclose the State's proof by limiting the State to the bare record of the conviction." *State v. Maynard,* 311 N.C. 1, 32, 316 S.E. 2d 197, 214 (1984). The Court's holdings in *Taylor* and *Maynard,* however, were much narrower than the language used to support them. *Taylor* involved simply the testimony of the pathologist who performed the autopsy on the victim of the prior first degree murder. The testi-

mony was offered by the state to show that the murder was an especially heinous one. *Maynard* involved testimony showing the severity of a prior felonious assault offered by the state to rebut defendant's contention that he had no significant history of prior criminal activity.

This Court has so far adhered to the principle that evidence at a sentencing hearing regarding a prior violent or capital felony should not be permitted to devolve into a "mini-trial" of that felony. *State v. McDougall,* 308 N.C. 1, 22, 301 S.E. 2d 308, 321, *cert. denied,* 464 U.S. 865, 78 L.Ed. 2d 173 (1983) ("The proper exercise of [the trial judge's discretionary] authority will prevent the determination of [the prior violent felony] aggravating circumstance from becoming a 'mini-trial' of the previous charge"); *State v. Silhan,* 302 N.C. 223, 275 S.E. 2d 450 (1981).

A mini-trial of defendant's former conviction contravenes the intent of our capital sentencing statute and in this case, where the only aggravating circumstance available to the state is defendant's prior conviction, violates defendant's federal constitutional privilege against double jeopardy and denies him due process of law. One who has been convicted of a felony occupies a certain status, *i.e.,* the status of a convicted felon. If he again commits a crime, it is altogether proper for a sentencing authority to consider his status as a convicted felon in determining the appropriate sentence for the later crime. But to permit a capital sentencing jury to consider the details concerning defendant's manner of committing, motive and culpability for the prior crime invites the jury to impose the death penalty, not on the basis of his guilt for the crime being tried, aggravated by his convicted felon status, but on the basis of his guilt of the prior crime, committed in the past and for which defendant has already once been punished. This procedure does not accord defendant due process because it tends to confuse and distract the jury "by focusing too much of its attention on the question of defendant's guilt or degree of culpability in [the] prior crime." *State v. McDougall,* 308 N.C. 1, 38-39, 301 S.E. 2d 308, 330 (Exum, J., dissenting as to sentence); *see also State v. McCormick,* 397 N.E. 2d 276 (Ind. 1979).

### III.

I see no basis for admitting into evidence, by way of the state's extensive cross-examination of defendant, much of it over

State v. Cummings

defendant's objection, defendant's prior, nonviolent felony and driving under the influence convictions, his several prison escapes and the details surrounding them. None of this evidence goes to prove any aggravating circumstance permitted by our capital sentencing statute. Neither was it offered to rebut the mitigating circumstance that defendant had no significant prior criminal history, a circumstance that was never proffered by defendant and indeed could not have been successfully proffered because of his admitted prior conviction of a capital felony. I can ascertain no other proffered mitigating circumstance which this evidence could reasonably rebut.

I recognize that although he objected to much of it at trial, defendant has not assigned as error or brought forward in his brief any argument regarding the admission of this latter category of evidence. But it has long been the practice of this Court to examine carefully the transcript of a capital case to determine, on its own motion, whether there is error prejudicial to defendant, notwithstanding defendant's failure properly to preserve the error for appellate review. *State v. Strickland,* 290 N.C. 169, 225 S.E. 2d 531 (1976); *State v. Warren,* 289 N.C. 551, 223 S.E. 2d 317 (1976); *State v. Waddell,* 289 N.C. 19, 220 S.E. 2d 293 (1975); *State v. Buchanan,* 287 N.C. 408, 215 S.E. 2d 80 (1975); *State v. Chance,* 279 N.C. 643, 185 S.E. 2d 227 (1971); *State v. Atkinson,* 275 N.C. 288, 167 S.E. 2d 241 (1969); *State v. Fowler,* 270 N.C. 468, 155 S.E. 2d 83 (1967); *State v. McCoy,* 236 N.C. 121, 71 S.E. 2d 921 (1952).

Justice FRYE dissenting as to sentence.

For the reasons expressed in the Chief Justice's dissenting opinion in *State v. McKoy,* 323 N.C. 1, 372 S.E. 2d 12 (1988), which I joined, I believe the United States Supreme Court's decision in *Mills v. Maryland,* 486 U.S. ---, 100 L.Ed. 2d 384 (1988), requires that defendant be given a new sentencing hearing. Accordingly, I dissent from that portion of the Court's opinion which rejects defendant's argument based upon the holding of *Mills.* I concur in the remainder of the Court's opinion.