STATE OF NORTH CAROLINA v. JAMES LEON SIMPSON

No. 381A89

(Filed 26 July 1990)

**1. Criminal Law § 34.7 (NCI3d) — evidence of defendant's prior assault on murder victim — admissibility to show malice**

    Though defendant failed properly to preserve assignments of error with regard to admission of certain evidence for appellate review, the trial court in a first degree murder case nevertheless did not err in admitting evidence of defendant's prior assault on the victim, since it was admissible as tending to establish malice, an element of first degree murder, and thus was relevant to an issue other than defendant's character. N.C.G.S. § 8C-1, Rules 403 and 404(b).

    **Am Jur 2d, Evidence §§ 321, 324; Homicide § 310.**

**2. Criminal Law § 66.9 (NCI3d) — pretrial photographic identification — no impermissible suggestiveness**

    A pretrial photographic identification procedure was not impermissibly suggestive where two witnesses were each shown six photographs of black males; although only one picture depicted a balding, light-skinned black male, the suspect's bald spot was on the back rather than on the top of his head, where it would not necessarily be visible in a frontal view photograph; the witnesses were not instructed that any of the pictured men were suspects in the case; no suggestion was given that either witness need pick any of the pictured men as the person they saw on the night of the murder; and one witness's identification of another person to police on the night of the murder went to the credibility of his identification testimony, not its admissibility.

    **Am Jur 2d, Criminal Law § 974.**

3. **Criminal Law § 169.6 (NCI3d)— exclusion of evidence—failure to preserve for review**

   Defendant failed to preserve for review a question as to the exclusion of evidence which allegedly would have shown an inconsistency in one witness's testimony, where the trial court advised defendant that he could read any former statement by the witness into the record at the end of the day, but defendant failed to do so, and defendant failed to elicit the desired inconsistency from another witness whom he subsequently called and who read statements made by the first witness. N.C.G.S. § 15A-1446(a).

   **Am Jur 2d, Appeal and Review §§ 518, 520.**

4. **Criminal Law § 35 (NCI3d)— cross-examination of detective— another person as suspect—question impermissible**

   The trial court in a first degree murder case did not err in refusing to allow defendant to cross-examine a detective as to whether another person was a suspect at a particular time, since the question assumed a fact not in evidence; the question as phrased did not tend to establish that the other person committed the murder; and the excluded evidence therefore would have created a mere inference or conjecture regarding the guilt of another.

   **Am Jur 2d, Evidence § 441.**

5. **Criminal Law § 55 (NCI3d)— blood on defendant's shoes— expert witness in serology—testimony properly admitted**

   The trial court in a first degree murder case did not err in allowing the State's expert witness in serology to testify regarding the type of blood found on defendant's shoes, since the State was not required to prove that defendant wore the clothing in question at the time the crime was committed as a prerequisite to introducing the clothing into evidence, and the prevalence of type A blood in the general population, as well as its presence in both defendant and the victim, went to the weight of the evidence rather than to its admissibility.

   **Am Jur 2d, Expert and Opinion Evidence §§ 211, 300.**

**6. Criminal Law § 34.2 (NCI3d)— evidence of arson at murder victim's home—harmless error**

Evidence of arson at the victim's home two days after the murder, unconnected to defendant in any way, should have been excluded, but admission of photographs with respect thereto was harmless error because similar evidence was introduced without objection.

**Am Jur 2d, Evidence § 329.**

**7. Homicide § 15 (NCI3d)— witness's view of gun in defendant's car—evidence admissible**

The trial court in a first degree murder case did not err in allowing a witness to testify that four or five months before the murder he saw a sawed-off shotgun in defendant's car with a single barrel the size of a finger joint, since the murder weapon was never found; the ballistics expert opined that a twelve-gauge weapon was the murder weapon; and the witness's description of the gun he saw was insufficiently precise to negate the possibility that the weapon he saw in defendant's car was later used to murder the victim.

**Am Jur 2d, Homicide §§ 272, 276.**

**8. Homicide § 21.5 (NCI3d)— first degree murder—sufficiency of evidence**

Evidence was sufficient to be submitted to the jury in a first degree murder prosecution where it tended to show that the victim had rebuffed defendant's persistent advances from the time he stabbed her in the chest on 10 March 1988 until her murder on 1 October 1988; defendant was convicted of the stabbing just two days before the murder, after which he confronted the victim in her car in the parking lot at her work place; defendant called the victim's home on the evening of the murder and was informed by her son that she was probably with another suitor; two witnesses testified that they saw defendant outside the suitor's apartment building within minutes of the murder; the victim was killed by a shotgun blast at very close range as she cracked the apartment door to look out; and evidence that the victim was still wearing her jewelry, still had money in her purse, and had the back window of her car shattered while a TV was left in the car

permitted an inference that the victim was killed by someone she knew for a motive other than robbery.

**Am Jur 2d, Homicide §§ 315, 387, 388.**

9. **Criminal Law § 491 (NCI4th) — jury view of crime scene not allowed — no error**

The trial court did not err in denying defendant's request for a jury view of the crime scene where the court properly found that the photographs and diagrams used at trial were sufficient to assist the jury in visualizing the crime scene.

**Am Jur 2d, Homicide § 460; Trial §§ 73, 74.**

APPEAL by defendant pursuant to N.C.G.S. § 7A-27(a) (1989) from the imposition of a sentence of life imprisonment upon his conviction of murder in the first degree before *Cornelius, J.*, at the 15 May 1989 Criminal Session of Superior Court, FORSYTH County. Heard in the Supreme Court 9 April 1990.

*Lacy H. Thornburg, Attorney General, by G. Patrick Murphy, Assistant Attorney General, for the State.*

*William A. Hough III for defendant-appellant.*

WHICHARD, Justice.

Defendant was convicted of the first-degree murder of Shirley Ann Ford in a noncapital trial. We find no prejudicial error.

The State's evidence tended to show that defendant and the victim had been involved in a relationship for approximately seven years. On 10 March 1988 defendant stabbed the victim in the chest during an argument. The victim was hospitalized as a result of the stabbing and refused to see defendant afterwards, despite frequent attempts by defendant to communicate with her at work and at home.

James Jones testified that he met Shirley Ford in September 1987 while on work release from prison. She visited him in prison or at his sponsor's home until his release from prison on 31 August 1988. Jones and Ms. Ford saw each other three to four times a week and were planning to be married in December. On the evening of 1 October 1988 Ms. Ford and Jones were sitting and talking in Jones' apartment when they heard a noise, like something heavy

or solid hitting something, that sounded as if it came from close by. A few moments later they heard something solid hitting the apartment door. Jones went to the door and called out, but no one answered. As Jones heard a vehicle start its engine, he looked out the window and saw a white truck backing out of the parking lot. Thinking the truck was going to sideswipe Ms. Ford's car, Jones went outside to move it. He told Ms. Ford to keep the apartment door closed, but he did not know whether she locked the door.

When Jones moved the car he realized the back window had been shattered. After moving the car he looked toward his apartment building and saw a man walk quickly around the corner out of the back alleyway and go into the door of the apartment building. When the man went inside, Jones could see the top of his head and the side of his face through a window in the doorway.

Following a voir dire examination, Jones testified that the man he saw walking from the alleyway to the building was defendant. He walked by the apartment of Juanita Dobson, who lived next door. Her door was open, and she was watching television. After Jones told her he thought someone was trying to break into his apartment, she called the police and told him not to go back over to his apartment because he might get in trouble. When Jones stepped outside, he saw police arriving at the end of the street, so he waited for them.

At some point between the time Jones saw the man go from the alleyway into the apartment house and the time he saw the police arriving, Jones heard a noise like a gunshot coming from the direction of his apartment. Before the police arrived, Jones saw the driver of the white truck, later identified as Benjamin Singletary, go into the hallway of the apartment building and up the stairs. When Jones opened the door to his apartment, it was unlocked, and he saw Shirley Ford lying on the floor dead. The back door to the apartment was open, though Jones testified that he never used that door.

Dr. Thad Jones, an expert pathologist, testified that the top of the victim's head had been blown off by the explosive force of a shotgun wound. The brain was missing from the skull cavity at the time of autopsy. The absence of pellet wounds and the severity of skin laceration led Dr. Jones to conclude that the fatal wound had been inflicted from very short range.

STATE v. SIMPSON

[327 N.C. 178 (1990)]

Benjamin Singletary, the driver of the white truck, testified that he was visiting Danny Rogers, the tenant of the apartment located above Jones' apartment, on the night of the murder. Singletary was driving slowly through the parking lot looking for an automobile he had loaned to Danny Rogers. A man walked in front of Singletary's truck, giving him the opportunity to observe the passerby's face. Following voir dire, Singletary identified this man as defendant. After defendant walked by the truck, Singletary located his car in the parking lot, parked his truck, and walked upstairs to Danny Rogers' apartment. While he was knocking at Rogers' door, police came to the apartment below, accompanied by James Jones. On cross-examination, Singletary agreed that on the night of the murder he identified Jones as the person who walked past his truck, although he testified that he knew it was not Jones on the night of the murder, but "that night it really didn't matter because I really didn't want to be involved, to be frank about it."

Detective K.W. Bishop of the Winston-Salem Police Department described the crime scene. The victim was lying on the floor of the apartment to the right of the entrance door. Blood and human tissue were splattered on the walls, floor, and objects in the apartment. Because of the presence of blood on items behind the door, Detective Bishop opined that the victim had been peering out from behind the door when she was shot. Lead pellets and shotgun shell wadding from a twelve-gauge shotgun were found among the debris. The victim's pocketbook containing twenty dollars and a handgun was found in the kitchen.

The police searched defendant's house pursuant to a warrant on 6 October 1988. They seized a pair of athletic shoes and several twelve-gauge shotgun shells. None of these shells contained triple aught pellets, the type of pellets found at the murder scene. Defendant's athletic shoes were stained with a red substance later identified as type A blood, the blood type of both the victim and defendant.

Defendant presented testimony by Carol Booth and Gevette Melton, two roommates who lived in an upstairs apartment across the parking lot from James Jones. Both heard a loud noise on the evening of the murder and saw a tall, dark-skinned black male running down the street with something in his hand. Both stated that defendant was not the man they saw in the parking lot that night.

Juanita Dobson testified that James Jones knocked on her door and asked her to call the police, then stated, "I believe that man done killed that woman." She denied ever telling Jones not to go back to his apartment. Danny Rogers testified that Benjamin Singletary told him he believed James Jones killed the victim.

Eric Simpson, defendant's son, testified that defendant was at home watching the Olympics on television with him on the night of 1 October 1988 until 12:30 a.m.

Additional facts will be discussed as necessary to clarify the issues on appeal.

[1]  Defendant assigns error to the admission of testimony by John Ford, the victim's son, and Willie Lee Ford, her brother, regarding the 10 March 1988 incident during which defendant stabbed the victim in the chest. Defendant argues the evidence was inadmissible under N.C.G.S. § 8C-1, Rule 404(b) and more prejudicial than pro-bative under N.C.G.S. § 8C-1, Rule 403.

Defendant has failed to preserve these assignments of error properly for appellate review. Although defendant did lodge two general objections during Willie Lee Ford's account of the victim's hospitalization following the stabbing, he failed to object to Ford's statement that it was defendant who stabbed the victim. In addition, defendant did not object to the admission of John Ford's account of the stabbing. Thus, later admission of similar evidence waived any benefit of the prior objection, and defendant is deemed to have waived his right to assign error to the prior admission of Willie Lee Ford's testimony. *State v. Shamsid-Deen*, 324 N.C. 437, 445, 379 S.E.2d 842, 847 (1989).

Defendant filed a motion in limine to suppress John Ford's testimony regarding the altercation between defendant and the victim on 19 March 1988. The motion did not state Rule 404(b) as a ground for excluding John Ford's testimony. The trial court conducted a voir dire examination of the witness, after which it ruled the testimony admissible. Defendant objected neither to this ruling nor to the admission of John Ford's testimony before the jury. When the court asked whether defendant wished to argue the motion, counsel responded that "[t]he purpose of the voir dire was to test the *relevancy* of the witness's testimony." (Emphasis added.) Failure to make timely objection or exception at trial waives the right to assert error on appeal. *State v. Gardner*, 315 N.C.

444, 447, 340 S.E.2d 701, 704-05 (1986). While a defendant need not renew his objection before the jury if he has excepted to an adverse ruling following a voir dire examination, defendant failed to follow either course of action in the instant case, and thus has waived his right to assert error on appeal. *State v. Shamsid-Deen*, 324 N.C. at 446, 379 S.E.2d at 847-48.

Assuming proper preservation of these assignments of error, the trial court did not err in admitting the accounts of defendant's prior assault on the victim. Evidence of another offense is admissible under Rule 404(b) so long as it is relevant to any fact or issue other than the character of the accused. *State v. Coffey*, 326 N.C. 268, 278, 389 S.E.2d 48, 54 (1990). The evidence of defendant's prior assault on the victim tends to establish malice, an element of first-degree murder, and thus is relevant to an issue other than defendant's character. *State v. Spruill*, 320 N.C. 688, 693, 360 S.E.2d 667, 669 (1987) (evidence of defendant's prior assaults on victim, his former girlfriend, admissible under Rule 404(b) ), *cert. denied*, 486 U.S. 1061, 100 L. Ed. 2d 934 (1988).

Defendant argues that the danger of unfair prejudice substantially outweighed the probative value of the disputed evidence, rendering the evidence inadmissible under Rule 403. "Whether to exclude evidence under Rule 403 is a matter left to the sound discretion of the trial court. . . . Evidence which is probative of the State's case necessarily will have a prejudicial effect upon the defendant; the question is one of degree." *State v. Coffey*, 326 N.C. at 281, 389 S.E.2d at 56. The trial court did not abuse its discretion under Rule 403 in admitting the evidence of defendant's prior assault on the victim, nor did it err in admitting the evidence under Rule 404(b). These assignments of error are overruled.

[2] Defendant next challenges the admission of two witnesses' in-court identification testimony. Defendant argues that the pretrial photographic lineup used by the police was unnecessarily suggestive, resulting in a substantial likelihood that James Jones and Benjamin Singletary mistakenly identified defendant as the man they saw outside the apartment building on the night of the murder. After conducting a voir dire examination of each witness, the trial court, prior to allowing either witness to identify defendant before the jury, entered findings of fact and concluded that the pretrial identification procedure was not impermissibly suggestive and did not result in a substantial likelihood of misidentification. Following the

respective voir dire hearings, both Jones and Singletary testified that they saw defendant outside the apartment building where the victim was killed within minutes of the murder.

"Identification evidence must be suppressed on due process grounds where the facts show that the pretrial identification procedure was so suggestive as to create a very substantial likelihood of irreparable misidentification." *State v. Wilson*, 313 N.C. 516, 528-29, 330 S.E.2d 450, 459-60 (1985). We must examine the totality of the circumstances to determine whether the photographic lineup used was "so unnecessarily suggestive and conducive to irreparable mistaken identity as to offend fundamental standards of decency and justice." *State v. Hannah*, 312 N.C. 286, 290, 322 S.E.2d 148, 151 (1984). Only if we conclude that the pretrial identification procedure was impermissibly suggestive do we reach the question whether the procedures employed resulted in a substantial likelihood of misidentification. *Id.*

James Jones testified during voir dire that he gave the police a description of a tall, light-skinned black male with long hair combed straight down and a bald spot on the back of his head. Jones could not remember whether he told the police if the man had any facial hair. He did tell them that he thought he could recognize him if he saw him again. Three days later Detective Bishop showed him a photographic lineup of six black males. Detective Bishop did not indicate which, if any, of the men shown was a suspect in the case. Jones identified defendant's picture as the man he had seen outside his apartment building. On cross-examination, Jones agreed that two of the six males pictured in the photographic lineup had the requisite light complexion. Only one of the pictures showed a balding man, though Jones specified that the bald spot was on the back of the man's head, and the pictures showed a frontal view only. Thus, in Jones' opinion only defendant's picture showed a balding light-skinned black male. The trial court made the following pertinent findings:

> [T]hat on October 4th, 1988, [Jones] observed Exhibit Number 16, a sheet with six photographs of black male individuals approximately the same age, each with facial hair, two being brown-skinned people and the rest being darker skinned; that of these six people only one person had an obvious bald feature; that at the time he looked at these photographs, he was simply told by the officer to look at the photographs, take his time

STATE v. SIMPSON

[327 N.C. 178 (1990)]

and observe each photograph; that no other statement was made by the officer about the photographs and that he was not told whether or not the suspect was in that particular photographic lineup; that he picked on Exhibit Number 17 as shown on the xeroxed copy — picked the photograph circled shown as Number 2; that he observed the individual seated in the courtroom as being the defendant and has indicated to the Court that this is the individual he saw on that occasion; that there was no identification on the photographs that gave any indication as to whether any of the individuals were suspects[;] that there was no discussion between the officer and the witness other than simply to look at the photographs and that the officer made no statement to induce the witness to pick any one of the six; that the description he gave the officer on this occasion is similar to the description of the defendant as he sits in the courtroom; that the level of certainty of the witness as to the identification of the defendant is sure.

Based on these findings, the trial court concluded that the identification procedure was not impermissibly suggestive and that admission of Jones' identification testimony would not violate defendant's due process rights.

Benjamin Singletary testified during voir dire that the person who walked past the headlight of his truck was slightly balding on top. He wore no shirt, had hair on his chest, and was brown-complected. He had a light beard and his hair was combed down. On the night of the murder, a police officer asked Singletary if James Jones was the person he saw, and Singletary said that he was. On 25 October, Detective Bishop came to Singletary's house and showed him a photographic lineup of six black males. Singletary immediately identified defendant's photograph as depicting the man he had seen on the night of the murder. Like Jones, Singletary identified two pictures in the photographic lineup as showing black males with light skin. Singletary agreed that only defendant's picture showed a balding, light-skinned black male. The trial court made the following pertinent findings:

[T]hat on October 25th, [Singletary] was approached by Officer Bishop at his residence and that he was shown a photo display folder marked as State's Exhibit Number 13; that this folder contains six photographs of six black male individuals approximately the same age, each with facial hair, two of the in-

dividuals being light-skinned, the other four being dark-skinned individuals, one of the individuals being bald in front; that there were no marks on the folder or any identifications on the folder; that the officer showed him the folder, made no statement concerning whether or not any suspect was on this particular folder, just simply asked him to look at the photographs and testify if he could make an identification of anyone; that he looked carefully at the photographs; that he identified the individual in the Number 2 position as being the individual that he observed on October the 1st, 1988, in the parking lot of the apartment complex; that previously the witness had indicated to investigating officers that the individual that was in the company of the officer on the occasion in question—on the night in question was the individual that he had observed approaching his vehicle; that this identification was incorrect in that under the excitement of the moment and the fact that the individual was in the custody of the officer or with the officer, he assumed that he was the same individual in that he was not wearing a shirt also; that the description the individual witness gave to the officer matches the description of the defendant in this action of this matter.

Based on these findings, the trial court concluded that "the credibility of the identification evidence is for the jury to weigh and the pretrial identification procedure of the photographic display involving the defendant was not so impermissibly suggestive as to violate the defendant's right to due process of law."

In arguing that the photographic display was *unnecessarily* suggestive, rather than impermissibly suggestive, defendant misstates the relevant legal standard. In addition, defendant focuses on the fact that only one of the pictures depicted a balding, light-skinned black male. This argument ignores Jones' statement that the suspect's bald spot was on the back rather than the top of his head, where it would not necessarily be visible in a frontal view photograph. Most importantly, the argument ignores the fact that the witnesses were not instructed that any of the pictured men were suspects in the case. No suggestion was given that Jones or Singletary need pick any of the pictured men as the person they saw on the night of the murder. *Cf. State v. Wilson*, 313 N.C. at 529, 330 S.E.2d at 460 (officer's comments to witness suggestive in that they conveyed his belief that the suspect was present in the photographic display and in each lineup). In addition,

STATE v. SIMPSON

[327 N.C. 178 (1990)]

Singletary's initial identification of James Jones to the police does not disqualify him from thereafter testifying that he saw defendant on the night of the murder, as defendant argues. As the trial court concluded, such inconsistencies go to the credibility of the testimony, not its admissibility. *See State v. Cummings*, 323 N.C. 181, 188, 372 S.E.2d 541, 547 (1988), *death sentence vacated*, --- U.S. ---, 108 L. Ed. 2d 602 (1990).

The trial court's findings of fact are binding on appeal when supported by competent evidence. *State v. Hannah*, 312 N.C. at 291, 322 S.E.2d at 151-52. Our examination of the record evidence and the photographs used in the pretrial identification procedure fails to disclose substantial evidence of impermissible suggestiveness. The trial court's findings and conclusions that the photographic procedure did not violate defendant's due process rights are supported by ample evidence. These assignments of error are overruled.

[3] Defendant next argues that the trial court erred in sustaining an objection to his question to the witness James Jones. Defendant asked Jones whether he told Detective Rowe that "this girl across the street" had seen the same man outside the apartment building as had Jones. Defendant argues that the question was designed to elicit an inconsistency in Jones' trial testimony from an earlier statement made to police. Nothing in the record supports defendant's interpretation of this alleged former statement as being inconsistent with Jones' trial testimony, and defendant neglected to preserve the proffered evidence by making an offer of proof. Although the trial court advised defendant that he could read any former statement by Jones into the record at the end of the day, defendant failed to do so. Having deprived this Court of the necessary record from which to ascertain whether the alleged error was prejudicial, defendant has precluded proper consideration of this assignment of error, and it is deemed waived. N.C.G.S. § 15A-1446(a) (1988); *State v. Miller*, 321 N.C. 445, 452, 364 S.E.2d 387, 391 (1988). In addition, we note that defendant called Detective Rowe as a witness and failed to elicit the desired inconsistency from his reading of Jones' earlier statements. Indeed, his testimony makes clear that the girl across the street, to whom defendant referred in his question to Jones, was not Juanita Dobson, as argued by defendant, but was one of the roommates who lived upstairs in the building across from Jones, and who testified on defendant's behalf. This assignment of error is without merit.

STATE v. SIMPSON

[327 N.C. 178 (1990)]

[4]   Defendant next argues that the trial court erred in sustaining an objection to his question to Detective Bishop. Defendant asked Detective Bishop during cross-examination whether James Jones was "still a suspect at that time." Defendant argues that this question falls within the category of evidence pointing directly to the guilt of one other than the defendant, admissible under prior case law. *See State v. McElrath*, 322 N.C. 1, 366 S.E.2d 442 (1988); *State v. Cotton*, 318 N.C. 663, 351 S.E.2d 277 (1987); *State v. Hamlette*, 302 N.C. 490, 276 S.E.2d 338 (1981). We disagree. The question assumes a fact not in evidence, *viz*, that Jones had previously been a suspect in the victim's murder; the State's objection was properly sustained on that ground alone. In addition, the question as phrased does not tend to establish that Jones committed the murder. The excluded evidence in *McElrath, Cotton,* and *Hamlette* was of an entirely different caliber than the answer sought by defendant's question to Detective Bishop. In *McElrath*, the excluded evidence consisted of a map and written notations indicating a possible larceny scheme, which arguably cast doubt on defendant's identity as the perpetrator of the crime charged. In *Hamlette*, evidence pointing to the existence of a love triangle was excluded as irrelevant. In *Cotton*, the excluded evidence would have shown that markedly similar crimes had been committed near the time and place of the charged assault, and that another victim identified a different suspect in a police lineup. The substantive evidence excluded at trial in these cases stands in marked contrast to the question posed by defendant whereby he sought to establish the guilt of another in an entirely conclusory manner by attempting to elicit the detective's agreement that Jones had at one time been a suspect in the case. We note that Jones was subject to extensive cross-examination regarding his actions on the night of the murder, and that no direct or substantive evidence pointing to his guilt was excluded at trial. The question asked by defendant falls within the class of evidence which creates a mere inference or conjecture regarding the guilt of another, *Cotton*, 318 N.C. at 667, 351 S.E.2d at 279, and is therefore not governed by *McElrath, Cotton,* or *Hamlette*. This assignment of error is overruled.

[5]   Defendant next argues that the trial court erred by allowing the State's expert witness in serology to testify regarding the type of blood found on defendant's shoes. Brenda Bissette, a forensic serologist employed by the State Bureau of Investigation, testified that she observed a possible bloodstain on tennis shoes submitted

STATE v. SIMPSON

[327 N.C. 178 (1990)]

to her by the police. She performed tests on the stain and determined that it was composed of human blood, type A. She also testified that both defendant and the victim, as well as forty percent of the general population, have type A blood. At trial, defendant contended that this evidence was of no probative value because of the general prevalence of type A blood, and because defendant has type A blood. He also argued that the State failed to introduce evidence showing that defendant wore the tennis shoes at the scene of the crime.

The State need not prove that defendant wore the clothing in question at the time the crime was committed as a prerequisite to introducing the clothing into evidence. "That there was no direct evidence showing that defendant had in fact worn this clothing during the assault goes to the weight of the evidence rather than to its admissibility." *State v. Bundridge*, 294 N.C. 45, 58-59, 239 S.E.2d 811, 820 (1978). The prevalence of type A blood in the general population, as well as its presence in both defendant and the victim, also goes to the weight of the evidence rather than to its admissibility. *See State v. Fulton*, 299 N.C. 491, 496-97, 263 S.E.2d 608, 611 (1980). Defendant argues that the probative value of this evidence was outweighed substantially by the danger of unfair prejudice. We disagree. The corollary to the weak probative value of this type of blood grouping evidence is its minimal potential to prejudice defendant or confuse the issues. *See id.* The expert not only testified that defendant, the victim, and forty percent of the general population carry type A blood, but also that she had no opinion as to whose blood was on the shoe or as to how long the bloodstain had been on the shoe. The trial court did not err in admitting the testimony of the serologist. This assignment of error is without merit.

[6] Defendant next assigns error to the trial court's admission into evidence of two photographs depicting the victim's house in a burnt condition. Assistant Fire Marshal Rick Plunkett testified that intense fire damage occurred at the victim's former residence on 3 October 1988 as a result of arson. The photographs were used to illustrate his testimony. We agree with defendant that evidence of arson at the victim's home two days after the murder, unconnected to defendant in any way, should have been excluded. Facts and circumstances which raise only conjecture as to the possibility of collateral incriminating circumstances should be excluded to prevent distracting the attention of juries from material

matters. *State v. Gaskins*, 252 N.C. 46, 49, 112 S.E.2d 745, 747 (1960). Admission of the photographs constitutes harmless error, however, because similar evidence was introduced without objection. Defendant failed to object to the fire marshal's testimony regarding the incidence of the fire. Admission of the photographs, standing alone, could not have prejudiced defendant, given that other evidence was heard regarding the arson. Defendant has demonstrated no reasonable possibility that had the photographs been excluded at trial, the jury would have reached a different result. N.C.G.S. § 15A-1443(a) (1988). Defendant has not argued that admission of the fire marshal's testimony constituted plain error, and such an argument could not prevail in light of the rigorous standard for plain error and the collateral nature of the evidence of arson. This assignment of error is therefore overruled.

[7] Defendant next argues that the trial court erred in overruling his motion in limine to exclude the testimony of Michael King. King was allowed to testify that he saw a sawed-off shotgun in defendant's car in late April or early May of 1988. King described the shotgun as having a single barrel the size of "a finger joint." Defendant contends that this evidence was irrelevant because the gun described by King did not match the description of the gun used to kill the victim, and the danger of unfair prejudice substantially outweighed any minimal probative value imparted by its admission. We disagree. Although the murder weapon was never found, the ballistics expert opined that the shotgun wadding and pellets found at the crime scene had been fired from a twelve-gauge weapon. King's description of a barrel the size of "a finger joint" is insufficiently precise to negate the possibility that the weapon he saw in defendant's car was later used to murder the victim. The evidence was properly admitted.

[8] Defendant contends the trial court erred in overruling his motion to dismiss the charge at the close of all the evidence. His argument centers around the perceived incredibility of Jones' and Singletary's identification testimony placing defendant at the scene of the murder. The evidence on a motion to dismiss must be viewed in the light most favorable to the State. *State v. Cummings*, 323 N.C. at 189, 372 S.E.2d at 547. From that perspective, we find substantial evidence of each element of first-degree murder and that defendant was the perpetrator. *Id.* at 188, 372 S.E.2d at 546. Murder in the first degree is the intentional and unlawful killing of a human being with malice, premeditation, and deliberation.

*Id*. at 188, 372 S.E.2d at 547. The evidence tended to show that the victim had rebuffed defendant's persistent advances from the time he stabbed her in the chest on 10 March 1988 until her murder on 1 October 1988. Defendant was convicted of the stabbing on 29 September 1988, just two days before the murder, after which he confronted the victim in her car in the parking lot at her work place. Defendant called the victim's home on the evening of the murder and was informed by her son that she was probably with James Jones. Two witnesses testified that they saw defendant outside Jones' apartment building within minutes of the murder. The physical evidence at the scene tended to show that the victim was killed by a shotgun blast at very close range as she cracked the door to look out of Jones' apartment. The victim was still wearing her jewelry, and her purse contained a gun and twenty dollars, thus negating robbery as a possible motive. The back window of the victim's car was shattered, and a television was left in the car. This evidence permits an inference that the victim was killed by someone she knew for a motive other than robbery. The circumstantial evidence implicating defendant was sufficiently substantial to withstand a motion to dismiss. The assignment of error is overruled.

[9] Defendant assigns error to the trial court's denial of his request for a jury view of the crime scene. The decision whether to permit a jury view is vested in the trial court's discretion. N.C.G.S. § 15A-1229 (1988). In the present case, the trial court stated that "based upon the evidence that has been presented, the Court feels the jury—with the photographs and the diagrams and the testimony of the witnesses, that they're able to visualize the scene of the crime." We find no abuse of discretion in the trial court's decision that the photographs and diagrams used at trial were sufficient to assist the jury in visualizing the crime scene.

Finally, defendant assigns error to the admission on rebuttal of evidence by his employment supervisor. Nancy Davis testified that defendant ordinarily had no difficulty walking, despite his use of a cane to walk at trial. Defendant did not object to this testimony at trial, but objected earlier that Davis's testimony rebutted nothing, but presented new evidence. Assuming that Davis testified to matters not previously heard, the trial court did not err. N.C.G.S. § 15A-1226 allows the court to permit a party to offer new evidence during rebuttal so long as the opposing party is permitted further rebuttal. N.C.G.S. § 15A-1226 (1988). This assignment of error is meritless.

For the reasons stated, we conclude that defendant received a fair trial, free from prejudicial error.

No error.