IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA20-65

Filed: 17 November 2020

Mecklenburg County, No. 16CRS246668-74, 17CRS000026-27

STATE OF NORTH CAROLINA

v.

JAMALL MONTE GLENN

Appeal by Defendant from judgments entered 22 July 2019 by Judge Lisa C. Bell in Mecklenburg County Superior Court. Heard in the Court of Appeals 9 September 2020.

*Attorney General Joshua H. Stein, by Assistant Attorney General Adrian W. Dellinger, for the State.*

*Massengale & Ozer, by Marilyn G. Ozer, for Defendant.*

COLLINS, Judge.

Defendant Jamall Monte Glenn appeals from judgments entered upon jury verdicts of guilty of robbery with a dangerous weapon, two counts of assault with a deadly weapon with intent to kill and inflicting serious injury, two counts of attempted first-degree murder, conspiracy to commit robbery with a dangerous weapon, and possession of a firearm by a felon. Defendant argues that (1) there was insufficient evidence of both his identity as the perpetrator and of a conspiracy to commit robbery with a dangerous weapon; (2) the trial court erred by sustaining the

State's objection to a question asked on cross-examination concerning a civil lawsuit filed by a witness; and (3) the trial court committed plain error by failing to strike ex mero motu an in-court identification of Defendant as the perpetrator. We discern no error.

## I. Procedural History

On 3 January 2017, Defendant was indicted on two counts of attempted first-degree murder, two counts of robbery with a dangerous weapon, two counts of assault with a deadly weapon with intent to kill and inflicting serious injury, one count of conspiracy to commit robbery with a dangerous weapon, one count of possession of a firearm by a felon, and one count of resisting a public officer. Before trial, the State dismissed the misdemeanor resisting arrest count and one count of robbery with a dangerous weapon. Defendant was tried before a jury in Mecklenburg County Superior Court between 15 and 22 July 2019. At the conclusion of the State's evidence, Defendant moved to dismiss all charges. The trial court denied the motion. Defendant did not present any evidence and renewed his motion to dismiss, which the court again denied. The jury found Defendant guilty of all charges, and the trial court sentenced Defendant to consecutive prison terms of 180 to 228 months, 180 to 228 months, and 60 to 84 months. Defendant gave notice of appeal in open court.

## II. Factual Background

The evidence at trial tended to show the following:  Between 7:00 and 7:30 p.m. on 17 December 2016, Bruce and Joanne Parker went to dinner with a group of friends in Charlotte, North Carolina.  After dinner, the Parkers walked to a nearby brewery.  Between 10:30 and 10:45 p.m., the Parkers left the brewery to return to their pickup truck, which they had parked before dinner.  The parking lot was large, dark, and had few other cars.

As Mr. Parker approached, he saw a medium-sized dark-colored car that had backed into the parking spot next to the driver's side of their truck.  Mrs. Parker saw at least three people in the car.  Mr. Parker first went to the passenger side of the truck to open the door for Mrs. Parker.  Once Mr. Parker had moved around to the driver's side of the truck, he heard someone at the back of the dark-colored car, near its trunk, ask "Hey, man, do you have a jack?"  Mr. Parker saw a silhouette of a person at the back of the car; Mrs. Parker saw "a black individual [who] had long dreadlocks." Mr. Parker responded that he did not have a jack.

Immediately after, Mr. Parker saw the driver's side door of the car opening. He saw a "large black male . . . [who] had a little difficulty getting out of [the car] because he was such a large man."  Mr. Parker estimated that the man was approximately six feet two to six feet three inches tall and described him as heavy set, with short hair, and having a "kind of a large face with puffy cheeks."

After exiting the driver's side door of the car, the man told Mr. Parker, "Don't resist." This was a different voice than had asked for a jack. Mr. Parker responded by putting his hands up and saying, "Here, take what you want." At that point, Mr. Parker estimated that the man who had exited the driver's side of the car was a foot to a foot and a half away from him. The man forced Mr. Parker to the ground. Once he was on the ground, Mr. Parker was shot in his side. At that time, he saw only the man who had exited the car. After being shot, Mr. Parker handed the man his wallet and his phone.

Mrs. Parker then started to come around to the driver's side of the truck and asked her husband if he was okay. At that point, she heard someone say to her, "shut the f*#k up, bi*#h." When she reached the back of the truck, she saw a "very large" black male "holding a gun in his right hand" leaning over the open driver's side door of the car. She then felt a searing pain in her abdomen as she was shot.

That night, two officers with the Charlotte Mecklenburg Police Department, Shabeer Mohammad and Bret Balamucki, were preparing for off-duty work. While driving in Balamucki's police car, the officers heard a gunshot nearby. They turned into the parking lot where they believed the gunshot occurred and Balamucki saw Mrs. Parker falling. Mohammad exited the patrol car and observed Mr. Parker hunched over. The dark-colored car was exiting the parking lot, approximately fifty to sixty feet away, and Mr. Parker pointed out the car to Mohammad and identified

the driver as the shooter. Mohammad saw a "black Toyota Camry with a large black male wearing a black jacket on the driver's side of the vehicle" who was "either putting something in the vehicle or trying to enter the vehicle." Balamucki observed a "large black male wearing a black jacket" who was "very husky, with short hair" entering the car and throwing something in the floorboard behind the driver.

Balamucki, still in his patrol car, began to pursue the Camry as it drove away. He followed the Camry out of the parking lot and maintained pursuit without losing sight until it collided with another car near Novant Health Presbyterian Hospital, crashed into a barrier, and came to a stop. Balamucki approached the accident and "observed two African-American males running from the car" towards the hospital. He could not tell what seat each of the men had gotten out of. He could tell, however, that one of the men running toward the hospital parking garage was the same person whom Mr. Parker had identified as the shooter and who had gotten into the back of the Camry.

Balamucki exited his car and pursued one of the men, who had dreadlocks and was wearing a peacoat-style black jacket. As he did so, he saw the other man going into the parking garage. Balamucki apprehended the man in the peacoat, who was identified as Antonio Worthy. Surveillance video showed two persons in the hospital garage, a "heavy set, tall black male with a short haircut" and "a light-skinned black

- 5 -

female with a heavy coat on, long hair, [and] dark colored pants." The two were recorded exiting the garage at 12:16 a.m.

On the driver's seat floorboard of the crashed car, officers found the gun used to shoot the Parkers. Mr. Parker's cell phone and wallet were also recovered from the car, as was a purse and driver's license belonging to Ebonee Ward.

While Balamucki was pursuing the Camry, the Parkers were taken to the hospital. Before being taken to surgery, Mr. Parker again gave a description of the shooter. Mr. Parker recalled describing the shooter as "a black male . . . approximately 280 pounds, 6-foot-2, and short hair." Officer Joseph Ellis, who briefly spoke with Mr. Parker in an elevator at the hospital, testified that Mr. Parker described the shooter as "[a] big black guy," and that Mr. Parker agreed that the shooter looked six foot five and 300 pounds. During the investigation, Mr. Parker gave officers a description of the shooter as having "a large face" and being "heavyset" with a "round face, with large facial features," and "puffy cheeks." He could not recall what the shooter was wearing.

At around 1:00 a.m. on 18 December, Defendant called the police to report a carjacking. When officers arrived to take the report, Ms. Ward was present and Defendant identified her as his girlfriend. Defendant reported that at around 9:00 p.m. the previous night he was pumping gas when someone held him at gunpoint, made Ms. Ward and him remove their clothes, and took his 2013 black

Toyota Camry and his belongings.  The paperwork and vehicle identification number that Defendant provided for the Camry showed that it was the same Camry involved in the shooting of the Parkers.  After Defendant gave another statement concerning the alleged carjacking, officers noticed multiple inconsistencies in the details of the report.

Approximately three to four days after the shooting, a detective with the Charlotte-Mecklenburg Police Department came to Mr. Parker's hospital room and asked him to look at a photo lineup.  At that time, Mr. Parker was unsure that he could identify the shooter, but agreed to look at the lineup.  Mr. Parker identified one of the six persons in the photo lineup as the shooter.  Though Defendant's photo was in the lineup, Mr. Parker identified another person.  Mr. Parker did not learn that he had not identified Defendant until the day prior to the trial.

On redirect examination, Mr. Parker indicated that he was able to make out the shooter's face during the attack.  The prosecution asked Mr. Parker, "Whose face were you able to make out?"  Mr. Parker then, without objection, identified Defendant in the courtroom.  Mr. Parker indicated that Defendant was "pretty much the same man as he was that night," only that he "appear[ed] a little bit thinner."

## III. Discussion

### A. *Sufficiency of the Evidence*

Defendant first argues that the trial court erred by denying his motion to dismiss because there was insufficient evidence both that he was the perpetrator of the offenses, and that there was a conspiracy to commit robbery with a dangerous weapon. We disagree.

This court reviews a trial court's denial of a motion to dismiss for insufficient evidence de novo. *State v. Smith*, 186 N.C. App. 57, 62, 650 S.E.2d 29, 33 (2007). "Upon defendant's motion for dismissal, the question for the court is whether there is substantial evidence (1) of each essential element of the offense charged, or of a lesser offense included therein, and (2) of defendant's being the perpetrator of such offense." *State v. Fritsch*, 351 N.C. 373, 378, 526 S.E.2d 451, 455 (2000) (citation omitted). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *State v. Smith*, 300 N.C. 71, 78-79, 265 S.E.2d 164, 169 (1980).

> In reviewing challenges to the sufficiency of evidence, we must view the evidence in the light most favorable to the State, giving the State the benefit of all reasonable inferences. Contradictions and discrepancies do not warrant dismissal of the case but are for the jury to resolve. The test for sufficiency of the evidence is the same whether the evidence is direct or circumstantial or both. Circumstantial evidence may withstand a motion to dismiss and support a conviction even when the evidence does not rule out every hypothesis of innocence.

*Fritsch*, 351 N.C. at 378-79, 526 S.E.2d at 455 (quotation marks and citations omitted).

### 1. Identity of the Perpetrator

The State introduced the following evidence at trial that Defendant was the perpetrator of the attack: When the officers arrived on scene, Mr. Parker pointed to a black Toyota Camry with a temporary license plate and a man nearby and said, "That's the guy who shot me." Balamucki looked and saw "a large black male wearing a black jacket, with a black hood. Darker pants. And he's . . . very husky, with short hair." Likewise, Mohammad saw Mr. Parker point and heard him say, "He just shot me." When Mohammad looked, he saw "a black Toyota Camry with a large black male wearing a black jacket on the driver's side of the vehicle. Kind of either putting something in the vehicle or trying to enter the vehicle." That night, Mr. Parker told officers that his attacker "was approximately 6-2. Approximately 280 pounds. A black male. And short hair." While Mr. Parker was hospitalized, he described the shooter as "a large male" with "a large face" who was "heavy set" with "puffy cheeks."

These descriptions matched a person shown on surveillance footage walking through the Novant Health Presbyterian Hospital parking garage after the black Toyota Camry collided with another car near the hospital, crashed into a barrier, and came to a stop. Defendant was the owner of the black Toyota Camry.

Additionally, Mr. Parker identified Defendant as the shooter in court:

Q: . . . Were you able to make out anyone's face?

A: Yes.

Q: All right. Whose face were you able to make out?

A: Jamall Glenn.

Q: And why do you say that now?

A: Because I can recognize him in this courtroom.

 . . . .

Q: . . . Why after now, sitting here today and seeing him, why do you now say you recognize him?

A. Because he's almost—he's pretty much the same man as he was that night.

Q: Okay. Does he appear different to you now that you've seen him for the first time in almost three years?

A: He appears a little bit thinner.

Mr. Parker testified that he was "maybe a foot, foot and a half" from the shooter during the attack and could make out his attacker's face.

Although Defendant reported that his car was stolen from him at gunpoint on the night of the attack and Mr. Parker identified someone other than Defendant as the shooter in a photo lineup, such contradictions and discrepancies in the evidence "do not warrant dismissal of the case but are for the jury to resolve." *Fritsch*, 351 N.C. at 379, 526 S.E.2d at 455.

Defendant also argues that the forensic evidence contradicts his identity as the driver of the Camry and the shooter. This argument is unavailing. Though the DNA samples found in the car and on the gun do not conclusively match Defendant, they are not inconsistent with Defendant either.

Viewing the evidence in the light most favorable to the State, there was sufficient evidence to submit the question of whether Defendant was the perpetrator to the jury. Accordingly, the trial court did not err by denying the motion to dismiss.

### 2. Conspiracy to Commit Robbery with a Dangerous Weapon

"A criminal conspiracy is an agreement between two or more persons to do an unlawful act or to do a lawful act in an unlawful way or by unlawful means." *State v. Bindyke*, 288 N.C. 608, 615, 220 S.E.2d 521, 526 (1975). While an agreement may be shown by direct proof of an express agreement, it is "generally inferred from an analysis of the surrounding facts and circumstances." *State v. Fleming*, 247 N.C. App. 812, 819, 786 S.E.2d 760, 766 (2016). "The proof of a conspiracy 'may be, and generally is, established by a number of indefinite acts, each of which, standing alone, might have little weight, but, taken collectively, they point unerringly to the existence of a conspiracy.'" *State v. Lawrence*, 352 N.C. 1, 25, 530 S.E.2d 807, 822 (2000) (citation omitted).

The execution of an attack in a coordinated manner and joint flight after the attack have been held sufficient evidence to survive a motion to dismiss a conspiracy charge. *State v. Lamb*, 342 N.C. 151, 155-56, 463 S.E.2d 189, 191 (1995); *State v. Miles*, 833 S.E.2d 27, 31 (N.C. Ct. App. 2019). In *Lamb*, our Supreme Court found sufficient evidence of a conspiracy to commit robbery with a dangerous weapon where "defendant met with two other men, one of whom was armed" and "the three men

drove to the home of the victim . . . left the vehicle and entered the victim's home, robbed the victim, and shot him." 342 N.C. at 155-56, 463 S.E.2d at 191. Similarly, in *Miles* this Court found sufficient evidence of a conspiracy to commit robbery with a dangerous weapon where defendant was one of four people in two cars at the scene of the crime, one of the cars honked the horn to get the victim's attention, defendant approached the victim with a weapon and exchanged gunfire, three men including defendant were witnessed fleeing the scene, and defendant got back into one of the cars. 833 S.E.2d at 31.

As in *Lamb* and *Miles*, the State has introduced sufficient evidence of a conspiracy to commit robbery with a dangerous weapon. Viewing the evidence in the light most favorable to the state, a reasonable juror could conclude that Defendant acted in coordination with Mr. Worthy and Ms. Ward to rob the Parkers with a dangerous weapon. Mr. Parker heard the voice of one person ask for a jack and the voice of another from his attacker. Once the robbery was underway, Mr. Parker heard two people outside of the car: the man who attacked him, and another person near the car's trunk area. After knocking Mr. Parker to the ground, the assailant shot him and took his phone and wallet. Following the shooting and robbery, the three persons fled in the car together. When the car crashed, police apprehended Mr. Worthy and found the gun, Mr. Parker's phone, and Mr. Parker's wallet in the car. Meanwhile, Defendant and Ms. Ward continued to flee together through the hospital parking

garage. They later called police claiming that Defendant's car was stolen. When a detective showed Defendant surveillance video from the hospital, he responded that "It wasn't me driving," a tacit admission that he was in the car. Taken together, these facts are sufficient to permit an inference by the jury that Defendant was a member of a conspiracy to commit robbery with a dangerous weapon. The trial court therefore did not err by denying the motion to dismiss that charge.

### B. Testimony Concerning the Civil Lawsuit

Defendant also argues that the trial court erred by sustaining the State's objection to Defendant's question concerning a civil lawsuit filed by the Parkers. We disagree.

The admissibility of evidence under N.C. Gen. Stat. § 8C-1, Rule 401, is governed by a threshold inquiry into its relevance. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C. Gen. Stat. § 8C-1, Rule 401 (2019). "Trial court rulings on relevancy technically are not discretionary." *State v. Holmes*, 263 N.C. App. 289, 302, 822 S.E.2d 708, 720 (2018), *review denied*, 372 N.C. 97, 824 S.E.2d 415 (2019). "Whether evidence is relevant is a question of law . . . [and] we review the trial court's admission of the evidence de novo." *State v. Kirby*, 206 N.C. App. 446, 456, 697 S.E.2d 496, 503 (2010). Even though we review these rulings de novo, we give "great deference on appeal" to

trial court rulings regarding whether evidence is relevant. *State v. Allen*, 828 S.E.2d 562, 570 (N.C. Ct. App.), *appeal dismissed, review denied*, 373 N.C. 175, 833 S.E.2d 806 (2019).

On cross-examination, Defendant asked Mr. Parker, "And [Mr. DeVore's] the attorney that you and your wife have hired and have filed a civil lawsuit in this case; correct?" The State objected and the jury was excused. Through argument of counsel and the trial court's questioning, it was determined that the Parkers had filed a lawsuit alleging ineffective or inadequate security against the owner of the parking lot in which the attack at issue took place. Defendant was identified in the lawsuit as the assailant.

Defense counsel explained that he only intended to ask that single question, that he may request a jury instruction on "a person interested in the outcome of the case[,]" and that "we know that in that circumstance, that's a monetary thing." Defendant further explained, "I simply want [Mr. Parker] to acknowledge, which he has, that there is a civil suit."

In ruling on the objection, the trial court stated:

> [A]s I would understand the issue for the civil complaint, liability is being argued on the basis that there was a violent armed robbery and attack in this parking lot.
>
> It's not necessary to prove in that civil lawsuit that it was [Defendant], but simply that that attack occurred. And that's what would potentially give rise to liability on the part of the parking lot owner or management company.

> So whether or not [Defendant] was involved is, I think, actually immaterial to the lawsuit.
>
> Because his involvement is . . . immaterial in that lawsuit and . . . the defense is not contesting that the robbery and shooting occurred. That's what would give rise to the liability [in the civil suit]. Based on that analysis I find that it's not material to this case, therefore not relevant.[1]

The trial court therefore sustained the State's objection and instructed the jury to disregard Defendant's last question and the witness's last statement.[2]

On appeal Defendant argues, as he did at trial, that the civil lawsuit was relevant because it showed that the Parkers had an interest in the outcome of the criminal prosecution. In conducting a de novo review of the trial court's decision, we agree with its analysis on this issue. "A party to an action or proceeding, either civil or criminal, may elicit from an opposing witness on cross-examination particular facts having a logical tendency to show that the witness is biased against him or his cause, or that the witness is interested adversely to him in the outcome of the litigation." *State v. Hart*, 239 N.C. 709, 711, 80 S.E.2d 901, 902 (1954). Our courts have consistently held that where a witness for the prosecution has filed a civil suit for damages *against the criminal defendant himself*, the pendency of the suit is admissible to impeach the witness by showing the witness's interest in the outcome

---

[1] The trial court stated that the ruling did not necessarily apply if defense counsel wished to impeach Mr. Parker's criminal trial testimony with statements he had made under oath in the civil complaint. Defense counsel stated that he would not be doing so, and did not attempt to do so at trial.

[2] The record does not clearly reflect whether Mr. Parker answered the question concerning the civil suit.

of the criminal prosecution. *See id.* at 711, 80 S.E.2d at 902; *State v. Dixon*, 77 N.C. App. 27, 31-32, 334 S.E.2d 433, 436 (1985); *State v. Grant*, 57 N.C. App. 589, 591, 291 S.E.2d 913, 915 (1982).

Defendant did not seek to question Mr. Parker about a suit the Parkers had filed against *Defendant*, but instead sought to question Mr. Parker about a suit the Parkers had filed against *a third party*–the parking lot owner. As the trial court explained, it is not necessary for the Parkers to prove in the civil suit that Defendant was the assailant, but simply that the attack occurred. Defendant's alleged involvement in the attack was immaterial to the civil suit. Thus, unlike in *Hart*, *Dixon*, and *Grant*, the pendency of the civil suit did not show Mr. Parker's interest in the outcome of the criminal prosecution and was accordingly not admissible to impeach the witness.

Defendant also argues, for the first time on appeal, that the civil lawsuit was relevant to Mr. Parker's in-court identification of Defendant. Specifically, he asserts that the "jury could not properly weigh [Mr. Parker's] identification of [Defendant] as the assailant without knowledge of what Mr. Parker had been told during preparation for the civil lawsuit." Defendant contends that the jury should have been able to consider the civil suit because it "showed Mr. Parker more likely than not had garnered knowledge from the civil investigation into the incident which tainted his identification of Mr. Glenn at the 2019 criminal trial."

Defendant did not raise this argument as to relevance at trial and it is not preserved for our review. "In order to preserve an issue for appellate review, a party must have presented to the trial court a timely request, objection, or motion, stating the specific grounds for the ruling the party desired the court to make if the specific grounds were not apparent from the context." N.C. R. App. P. 10(a)(1). "[I]t is well settled in this jurisdiction that defendant cannot argue for the first time on appeal [a] new ground for admissibility that he did not present to the trial court." *State v. Sharpe*, 344 N.C. 190, 195, 473 S.E.2d 3, 6 (1996). Defendant cannot now argue that the civil suit was relevant to Mr. Parker's in-court identification. Accordingly, the trial court did not err by sustaining the State's objection.

### C. In-Court Identification

Defendant's remaining argument is that the trial court plainly erred by failing to exclude ex mero motu Mr. Parker's in-court identification. Specifically, Defendant asserts that the identification was tainted such that its admission violated his rights to due process and a fair trial. We disagree.

As an initial matter, the State argues that Defendant has failed to preserve this issue for our review because he did not move to suppress the identification prior to trial. Defendant was not seeking to suppress a pre-trial identification of Defendant; the need to exclude the in-court identification did not arise until Mr. Parker identified Defendant at trial. Thus, "defendant did not have reasonable

opportunity to make the motion before trial[,]" N.C. Gen. Stat. § 15A-975(a) (2019), and Defendant was not required to file a motion to suppress the in-court identification to preserve the issue.

Defendant was, however, required to timely object to the in-court identification, N.C. R. App. P. 10(a)(1); this he failed to do. However, because Defendant has "specifically and distinctly contended" that the admission of the identification "amount[ed] to plain error," we will review the admission of the identification for plain error despite Defendant's failure to object at trial. N.C. R. App. P. 10(a)(4).[3]

"For error to constitute plain error, a defendant must demonstrate that a fundamental error occurred at trial." *State v. Lawrence*, 365 N.C. 506, 518, 723 S.E.2d 326, 334 (2012). "To show that an error was fundamental, a defendant must establish prejudice—that, after examination of the entire record, the error 'had a probable impact on the jury's finding that the defendant was guilty.'" *Id.* (quoting *State v. Odom*, 307 N.C. 655, 660, 300 S.E.2d 375, 378 (1983)).

> [T]he plain error rule . . . is always to be applied cautiously and only in the exceptional case where, after reviewing the

---

[3] Although Defendant argues both plain error and that the trial court failed to intervene ex mero motu, this elevated ex mero motu standard applies to opening and closing arguments to the jury. *See, e.g.*, *State v. Davis*, 349 N.C. 1, 23, 506 S.E.2d 455, 467 (1998) ("Where, as here, defendant failed to object to the arguments at trial, defendant must establish that the remarks were so grossly improper that the trial court abused its discretion by failing to intervene ex mero motu."). We will review this issue for plain error, the appropriate analysis for unpreserved evidentiary issues. *State v. Ridgeway*, 137 N.C. App. 144, 147, 526 S.E.2d 682, 685 (2000) ("Where . . . a criminal defendant fails to object to the admission of certain evidence, the plain error analysis, rather than the ex mero motu or grossly improper analysis, is the applicable standard of review.").

entire record, it can be said the claimed error is a "fundamental error, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done," or "where [the error] is grave error which amounts to a denial of a fundamental right of the accused," or the error has "'resulted in a miscarriage of justice or in the denial to appellant of a fair trial'" or where the error is such as to "seriously affect the fairness, integrity or public reputation of judicial proceedings" or where it can be fairly said "the instructional mistake had a probable impact on the jury's finding that the defendant was guilty."

*Odom*, 307 N.C. at 660, 300 S.E.2d at 378 (citation omitted).

Our Supreme Court has stated that

[i]dentification evidence must be suppressed on due process grounds where the facts show that the pretrial identification procedure was so suggestive as to create a very substantial likelihood of irreparable misidentification. . . . If it is determined that the pretrial identification procedure is impermissibly suggestive the court must then determine whether the suggestive procedure gives rise to a substantial likelihood of irreparable misidentification.

*State v. Powell*, 321 N.C. 364, 368-69, 364 S.E.2d 332, 335 (1988). The United States Supreme Court has clarified that "what triggers due process concerns is police use of an unnecessarily suggestive identification procedure . . . ." *Perry v. New Hampshire*, 565 U.S. 228, 232 n.1 (2012). "The Constitution . . . protects a defendant against a conviction based on evidence of questionable reliability, not by prohibiting introduction of the evidence, but by affording the defendant means to persuade the jury that the evidence should be discounted as unworthy of credit." *Id.* at 237.

Here, Defendant does not contend that the pre-trial photo lineup conducted by a detective while Mr. Parker was hospitalized was impermissibly suggestive, nor does Defendant challenge any pre-trial identification procedure employed by law enforcement. Instead, on appeal, Defendant argues that the in-court identification was tainted by Mr. Parker's exposure to media coverage of the case, his filing of a civil lawsuit which named Defendant as the assailant, the lapse of time, and his identification of someone other than Defendant in the photo lineup. Accordingly, Defendant's argument does not trigger due process concerns.

At trial, Mr. Parker testified on direct examination that he was one to one and a half feet away from his assailant, he was able to make out the assailant's face, and the assailant was Defendant. Defendant did not object. Following the in-court identification, Defendant cross-examined Mr. Parker concerning his exposure to media coverage of the case, the amount of time that had passed, the fact that Mr. Parker did not recant the initial identification in the photo lineup, and the circumstances under which Mr. Parker gave the descriptions and completed the photo lineup. During this cross-examination, Defendant did not seek to impugn Mr. Parker's in-court identification on the basis that it was tainted by the Parkers' civil lawsuit, as discussed above. The trial court subsequently instructed the jury that they were "the sole judges of believability of witnesses" and "must decide for [them]selves whether to believe the testimony of any witness."

Defendant had the opportunity to test the reliability of Mr. Parker's in-court identification "through the rights and opportunities generally designed for that purpose[,]" *Perry*, 565 U.S. at 233, and the defects of the in-court identification Defendant complains of were solely issues of credibility for the jury to resolve, *State v. Simpson,* 327 N.C. 178, 189, 393 S.E.2d 771, 777 (1990) (initial misidentification by witness did "not disqualify him from thereafter testifying that he saw defendant on the night of the murder"); *State v. Miller*, 270 N.C. 726, 732, 154 S.E.2d 902, 906 (1967) ("Where there is a reasonable possibility of observation sufficient to permit subsequent identification, the credibility of the witness' identification of the defendant is for the jury . . . .").

Without any indication that the in-court identification was tainted by an impermissibly suggestive pre-trial identification procedure, there was no error, let alone plain error, in admitting Mr. Parker's in-court identification.

## IV. Conclusion

Because there was sufficient evidence of Defendant's identity as the perpetrator and that Defendant conspired to commit robbery with a dangerous weapon, the trial court did not err by denying his motions to dismiss. The trial court did not err by concluding that cross-examination concerning the Parkers' civil suit was irrelevant. Without a showing that the police used impermissibly suggestive procedures in a pre-trial identification, the trial court did not err by admitting Mr.

Parker's in-court identification; the credibility of that identification was a question for the jury.

NO ERROR.

Judges STROUD and MURPHY concur.